CHRISTOPHER CROWLEY, executor,[1] *vs*. COMMUNICATIONS
FOR HOSPITALS, INC., & others.[2]

No. 89-P-1327.

Suffolk. February 15, 1991. - June 25, 1991.

Present: PERRETTA, JACOBS, & GILLERMAN, JJ.

*Corporation*, Stockholder, Close corporation, Officers and agents, Purchase
by corporation of its stock, Stockholder derivative suit. *Fiduciary*. *Con-
tempt*. *Practice, Civil*, Attorney's fees, Parties. *Jurisdiction*, Equitable.

In a civil action involving a stockholder's claims and a derivative claim on
   behalf of a close corporation against the officers and directors of the
   corporation, the judge's conclusion that the officers and directors had
   improperly and unfairly caused the corporation to pay them excessive
   compensation over a period of years was supported by extensive findings
   of fact that were based on detailed expert testimony and were not
   clearly erroneous. [756-757, 758-759]
Discussion of the cases setting forth the standards applicable to officers
   and directors of close corporations with respect to the compensation
   paid to themselves in their corporate capacities. [757-758]
In a civil action against the officers and directors of a close corporation,
   brought derivatively and on behalf of a stockholder, the judge's conclu-
   sion that a certain deferred compensation agreement was a deliberate
   diversion of corporate funds for the personal benefit of two of the direc-
   tors was supported by the evidence and was not clearly erroneous. [760-
   761]
A civil claim was remanded for additional findings with respect to the vio-
   lation of a certain preliminary injunction [761-762]; no error appeared
   with respect to the judge's findings and orders as to the violation of
   another preliminary injunction [762].
In a civil action, the judge's conclusion that two officers and directors of a
   close corporation had engaged in a scheme to freeze out one stockholder
   was supported by his findings of fact and was not clearly erroneous.
   [762-763]
In a civil action brought by a stockholder on his own behalf and deriva-
   tively against officers and directors of a close corporation, the judge

---

[1]Christopher Crowley, substitute plaintiff, is the executor of the estate of
his mother Lurana Crowley, the original plaintiff.
[2]William G. Dwyer; Julia Wagner and Gary Dunbrack, as coexecutors
of the estate of Paul S. Wagner. The individual defendants are collectively
referred to as the "defendants."

incorrectly awarded relief to only the plaintiff stockholder directly, without addressing the derivative claim, where the plaintiff alleged and proved the essential elements of a derivative action. [763-764, 765-766]

Discussion of cases setting forth the nature of relief available, to stockholders and to corporations, in derivative and stockholder actions brought as a result of officers and directors of a close corporation violating their fiduciary duties. [764-765]

This court set out the nature of the relief to be granted on a derivative claim on behalf of a corporation for certain officers' and directors' diversion of corporate funds for personal benefit and remanded the case for determination of the appropriate amounts of damages. [766-768]

CIVIL ACTION commenced in the Superior Court Department on January 6, 1982.

The case was heard by *Guy Volterra*, J.

*Morris M. Goldings* (*Richard S. Jacobs* with him) for the defendants.

*Traver Clinton Smith, Jr.* (*Michael R. Gottfried & Gary W. Smith* with him) for the plaintiff.

GILLERMAN, J. Following in the procedural footsteps of the plaintiff in *Donahue* v. *Rodd Electrotype Co.*, 367 Mass. 578, 579 n.4 (1975), the plaintiff Christopher Crowley prosecutes this action derivatively for the benefit of Communications for Hospitals, Inc. (the company), and directly for his own benefit as a stockholder of the company. The thrust of the action is the claim that the majority stockholders of the company, the defendants William G. Dwyer and Paul S. Wagner (now deceased), designed and executed a scheme to "freeze-out" the two minority stockholders, the plaintiff and one Fred S. Lakewitz (not a party to this action and now deceased). The plan was executed by the wrongdoers, according to the plaintiff, by their seizing a controlling interest in the voting shares of the company, diverting substantially all of the company's net income in the form of excessive compensation to themselves and family members, arranging for the preferential redemption of Wagner's shares in the company, refusing to declare dividends, and attempting to acquire the plaintiff's stock for a price substantially less than the price the company agreed to pay for Wagner's shares.

The relief sought is a judgment that the company redeem Crowley's stock at the same price the company agreed to pay for Wagner's shares; that Dwyer and Wagner pay the plaintiff his pro rata share of preferential dividends paid to Dwyer, Dwyer's sons, and Wagner in the form of excessive salaries, or, alternatively, that Dwyer and Wagner pay the company the entire amount of such excessive salaries; and that Dwyer and Wagner pay the plaintiff's legal bills in prosecuting this action.

In February, 1982, a judge of the Superior Court preliminarily enjoined the company and its officers and agents from paying Dwyer and Wagner compensation at more than the rate of $12,000 per person per year. In April, 1982, another judge preliminarily enjoined the company, Dwyer and Wagner from (i) transferring any of the voting shares of the company which Dwyer and Wagner had acquired from another stockholder, the estate of Donald A. Nickerson, and (ii) using corporate funds to pay the attorneys' fees of Dwyer and Wagner in defending this litigation.

In April, 1986, Crowley filed a complaint for contempt against Dwyer and Wagner alleging violations of the injunctions just described, and a five-day trial was held late in 1987. On August 9, 1988, the trial judge issued his consolidated findings,[3] rulings, and order for judgment — all favorable to the plaintiff in his own right (and not derivatively for the benefit of the company), including an award of attorneys' fees. Judgment was entered thereon, and the defendants appealed claiming errors in the judge's conclusions that (i) the compensation taken was excessive, (ii) the defendants had engaged in a "freeze-out scheme," (iii) the defendants had violated the injunctions, and (iv) the plaintiff was entitled to attorneys' fees.

1. *Undisputed background facts.* The company was organized in 1961 to conduct the business of selling, leasing, and

---

[3]The judge relied heavily upon findings prepared by prevailing counsel, but he sufficiently reworked the submission to make the findings the product of his own judgment. See *Cormier v. Carty*, 381 Mass. 234, 237-238 (1980); *Lewis v. Emerson*, 391 Mass. 517, 524 (1984).

servicing television receivers to local hospitals for patient use. The founder of the company was Daniel N. Crowley, the plaintiff's father. The initial issue of voting common stock was 306 shares to Crowley, 50 shares to the defendant Dwyer, 50 shares to the defendant Wagner, 50 shares to Fred Lakewitz (now deceased), and 144 shares to one Harry C. Royal — an arrangement which gave Crowley a majority of the outstanding stock. Dwyer, Wagner and Lakewitz were brought into the company because of their skill and experience in the business of the company. Both Crowley and Dwyer were directors at the commencement of operations;[4] Crowley was treasurer of the company and Dwyer was president. The judge concluded that the company was a close corporation within the meaning of *Donahue* v. *Rodd Electrotype Co.*, 367 Mass. at 586, and the defendants, understandably, do not contend otherwise. See *Bessette* v. *Bessette*, 385 Mass. 806, 808 n.4 (1982).

The company's Agreement of Association (formerly required by Massachusetts law as part of the incorporation process for business corporations) provided for restrictions on transfer, binding on the stockholders and their personal representatives, which gave the company a first option to acquire the stock of any selling stockholder at the price offered or at an arbitrated price. Royal's shares were purchased in this fashion by the company in 1964 in a transaction not now challenged; this left Crowley with 306 shares of the 456 shares outstanding. In 1965, however, Crowley transferred fifty percent of his stock to one Donald A. Nickerson. This left Crowley with 153 shares, Nickerson with 153 shares, and Dwyer, Wagner and Lakewitz each with 50 shares. Crowley had given up control of a majority of the outstanding shares of the company.

In mid-1974, Crowley ended his active participation in the affairs of the company. About the same time, Dwyer succeeded Crowley as treasurer of the company, and Nickerson

---

[4]The third director upon organization was Warren F. Rideout, an original defendant whose executors settled out on the first day of trial. Rideout remained a director until 1981.

died, leaving as his executor, Warren F. Rideout (see note 4, *supra*), as stockholder of record of Nickerson's 153 shares. On July 8, 1974, at a meeting of stockholders from which Crowley was absent, Rideout, Dwyer and Wagner, who together owned a majority of the outstanding common stock, were elected the three directors of the company. On August 23, 1974, Dwyer, Wagner and Rideout held a special meeting of directors at which they voted to waive the restrictions on transfer in order to permit the sale of 153 shares of the company owned by the Nickerson estate.[5] In September, 1974, Rideout, as Nickerson's executor, agreed to sell 77 shares of common stock to Dwyer and 76 shares to Wagner;[6] the transaction was consummated in July, 1975. These transfers gave Dwyer a total of 127 shares, and Wagner a total of 126 shares; together they controlled the company.

Finally, it is undisputed that on April 8, 1983, the company and Wagner entered into a "deferred compensation" agreement in the total amount of $129,000, payable in sixty monthly installments of $2,150, beginning January 15, 1986. The agreement was signed by Dwyer as president. There is nothing in the record to show any authorizing or ratifying vote of the directors or the stockholders. On the same day, Dwyer and Wagner entered a stock purchase agreement, Wagner agreeing to sell and Dwyer agreeing to buy all of

---

[5]The judge found that if the company had purchased the stock of the Nickerson estate, "Crowley's controlling interest would have been preserved." However, as noted earlier, Crowley's controlling interest could not be "preserved" because he had previously given up control when he transferred one-half of his holding to Nickerson, and he did so without reserving to himself or to his successors the right to purchase Nickerson's shares upon the latter's death or termination of employment. Moreover, the restrictions on transfer did not include any provision giving the nonselling stockholders the option to purchase the stock of a selling stockholder in the event the company did not elect to buy the shares offered to it. *Donahue* points out that the purpose of restrictions on transfer in a closely held corporation is to prevent unacceptable outsiders from acquiring an interest in the corporation. *Donahue*, 367 Mass. at 587 n.13. That purpose was not defeated by the transfer of the Nickerson shares.

[6]*Donahue* expressly declined to rule on share transactions in a close corporation when the corporation is not a party to the transaction. See *Donahue*, 367 Mass. at 593 n.18.

Wagner's shares (126) in the company for a total purchase price of $28,487.34.

2. *Excessive compensation to Dwyer, Wagner and Dwyer's sons.* The judge made extensive findings of fact from which he concluded that Dwyer and Wagner "caused the corporation to pay to themselves and Dwyer's family[7] remuneration grossly in excess of the fair value of the services they actually rendered to the corporation. . . ." The judge found that during the years 1978 through 1982, Dwyer was paid, in salary and bonuses, $385,475 and that the reasonable value of those services was $131,500, yielding an excess of $253,975. Wagner, who, because of failing health, did not perform any services of value to the company after 1978, nevertheless received $368,992 thereafter. As for Dwyer's three sons, the judge found that from 1978 through 1986, William M. received $325,862 and was overcompensated by $65,000; during the same period, John received $238,456 and was overcompensated by $57,580; during the years 1979 and 1980, Richard was paid $50,234 and was overcompensated by $14,925. The total of excess compensation paid to Dwyer, his sons, and Wagner during the periods indicated was $760,472.

What is reasonable compensation for officers of a corporation is a question of fact, see *Black* v. *Parker Manuf. Co.*, 329 Mass. 105, 116 (1952), and the findings of the judge are not clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). The judge had the benefit of detailed and extensive expert testimony, see *Sugarman* v. *Sugarman*, 797 F.2d 3, 12 (1st Cir. 1986), which he found persuasive, on the subject of compensation, and there were numerous subsidiary findings — none clearly erroneous — supporting the ultimate conclusion of excessive compensation. It is enough to say here that during the calendar years 1978 through 1982 the total compensation of Dwyer, Dwyer's sons and Wagner, ex-

---

[7]The judge effectively treated Dwyer and his two sons as a single unit. He was not in error in doing so. See *Donahue* at 601. See Principles of Corporate Governance: Analysis and Recommendations § 5.13 (Tent. Draft No. 11, April 25, 1991).

pressed as a per cent of the company's net income before taxes, and before such compensation, was 53.11% (1978), 76.38% (1979), 85.52% (1980), 86.69% (1981) and 85.10% (1982). This produced, not unexpectedly, only marginal increments to net stockholders' equity during the same period — from $69,863 at April 30, 1978 (the end of the company's fiscal year) to $81,110 at April 30, 1983.[8] Plainly Dwyer and Wagner had arranged to withdraw as compensation for themselves and members of Dwyer's family virtually the entire net income of the company during the years 1978 through 1982. Moreover, these distributions occurred during a period when gross revenue of the company declined 35% from a high of $1,339,571 in calendar 1979 to $866,290 in calendar 1982. In 1983 gross revenues declined still further to $762,355. Compensation for Dwyer, Wagner and Dwyer's son, while declining substantially during the period reviewed, nevertheless appeared to be a function of available net income, not performance, as the judge, with ample justification, found.[9]

Stockholder claims of excessive compensation to officers and directors have fared reasonably well in the courts, as *Donahue* v. *Rodd Electrotype Co.*, 367 Mass. at 590 n.15, points out. Even in the pre-*Donahue* corporate world, when the directors are also the officers, as is the usual case in close corporations, and the compensation is paid by the directors to themselves (or members of their families) as officers or employees, such self-dealing transactions were made subject to "vigorous scrutiny," placing upon the directors the burden of proving both the good faith of the transaction and "its inherent fairness from the viewpoint of the corporation *and those* interested therein" (emphasis supplied). *Winchell* v. *Plywood Corp.*, 324 Mass. 171, 177 (1949). See *Sagalyn* v.

---

[8]The values given for net stockholders' equity were taken from the audited financial statements of the company, and not from the judge's findings. Those statements were exhibits in the case, and we deem it necessary to consider them.

[9]The judge found that the compensation of Dwyer and Wagner for the years 1978 through 1982 was "substantially paid in a lump sum at the end of the fiscal year. . . ."

*Meekins, Packard & Wheat, Inc.*, 290 Mass. 434, 438-39 (1935) ("The court does not undertake to substitute its business view for that of those vested with the control of corporate affairs. Where personal advantage is involved, as in the fixing of salaries to be received by directors, there is a fiduciary element in issue which may be open to inquiry in a court of equity"); *American Discount Corp.* v. *Kaitz*, 348 Mass. 706, 711 (1965); *Dynan* v. *Fritz*, 400 Mass. 230, 241 (1987); *Houle* v. *Low*, 407 Mass. 810, 824 (1990).

While *Donahue*, 367 Mass. at 593, elevated the standard to the *utmost* good faith and loyalty, and extended the applicability of that standard to all stockholders in a close corporation, *ibid.*, Justice Wilkins, concurring, at 604, noted that the "broader issue" of corporate operations was not involved in *Donahue*. (But see *Donahue* at 593 n.18.) That broader issue came before the court in *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. 842, 851 (1976), upon which the defendants rely, where the court indicated that in cases involving the "business policy" of a corporation, including the salary level of officers, "the untempered application of the strict good faith standard enunciated in *Donahue*" would not be appropriate. *Id.* at 850-851. Instead, "[i]t must be asked whether the controlling group can demonstrate a legitimate business purpose for its action." *Id.* at 851. The "general principles of *Donahue* have been refined," wrote the court in *Zimmerman* v. *Bogoff*, 402 Mass. 650, 657 (1988).

We need not consider whether, or to what extent, the *Wilkes* refinement of *Donahue* in operational matters differs from the good faith and inherent fairness standard set out in *Winchell, supra,* see *Leader* v. *Hycor, Inc.*, 395 Mass. 215, 222 (1985); neither standard helps the defendants.[10] There is manifest unfairness to the excluded, nonconsenting minority

---

[10]There is also the question whether *Donahue's* higher standard is applicable to a derivative action. See *Dynan* v. *Fritz*, 400 Mass. 230, 242 n.17 (1987). For the reasons stated in the text, the difference in standards, if there is one, is immaterial to the outcome of this case. At all events, it is not clear why, in a close corporation case, such as *Dynan*, the duty owed to the corporation should be different from the duty owed to minority stockholders.

interests for the majority, year after year, to appropriate to themselves substantially all of the net income of the enterprise, and such an operational policy, which deprives the company, and therefore its stockholders, of all opportunities for growth in net worth, serves no legitimate business purpose. See *Zimmerman* v. *Bogoff*, 402 Mass. at 658.[11]

There was a clear admission of this overreaching conduct by the defendants in the Federal income tax returns of the company, admitted in evidence without limitation. There it appears, and the judge found, that for the years 1978 through 1982 the defendants Dwyer and Wagner claimed falsely (in order to conceal the excessive amounts paid to them as compensation) that they were employed full time with the company when in fact they were employed part-time, and that they owned 11 % of the company when in fact they owned 55.5 % of the company.

Undaunted, the individual defendants argue that the "corporation was entitled to pay a son with a college degree more than a nonrelative without a college degree." Perhaps the defendants believe that to be true, but we know of no decision in the corporate jurisprudence of this Commonwealth establishing hereditary entitlements to compensation without the consent of independent directors and a majority of the disinterested stockholders. See *Winchell* v. *Plywood Corp.*, 324 Mass. at 177. As noted earlier, there were no authorizing or ratifying votes of disinterested directors or of the minority stockholders in respect of compensation paid to the defendants. See *Tracy* v. *Curtis*, 10 Mass. App. Ct. 10, 19 (1980). The judge's findings on this branch of the case were not in error.[12]

---

[11]The "legitimate business purpose" test is not without its critics. See Keller, Corporate Freeze-Outs in Massachusetts — A Commentary, 30 Boston Bar Journal 11, 15, November/December (1986). Compare Principles of Corporate Governance: Analysis and Recommendations § 2.01 (Tent. Draft No. 11, 1991) ("a corporation should have as its objective the conduct of business activities with a view to enhancing corporate profit and shareholder gain").

[12]The defendants also argue that "it was advantageous for tax purposes for the corporation to pay salaries rather than declare dividends." It would

3. *The Wagner agreements.* As noted above, Wagner entered into two agreements on April 8, 1983. One, with the company, purported to be a deferred compensation agreement with monthly payments of $2,150 beginning January 15, 1986. The other was a sale to Dwyer of all of Wagner's stock in the company, delivery and payment to be made when not prohibited by the then outstanding injunction of the Superior Court.

The judge found that the "agreements, taken together, were a means of paying Wagner for his shares in the [c]orporation." There was an abundance of documents admitted in evidence which amply supported the judge's finding. For example, on October 21, 1982, the financial advisor to the defendants, who structured the two agreements, wrote counsel to the defendants, "[a]s you can see, the direct buyout [by Dwyer] would be consistent with minority shareholder valuation in the past [i.e., at book value]. *The deferred compensation is a method of giving Paul [Wagner], indirectly, the true market value of [his shares in] the corporation*" (emphasis added).

Some months earlier — the date is not clear — the same financial advisor, in recommending the two agreements, wrote to Wagner that Wagner was to receive "the $20,000 of existing deferred compensation and an additional $100,000 of deferred compensation . . . under a new deferred compensation agreement." This, he continued, would provide Wagner with a method of obtaining "a fair valuation of the stock," and would enable "the Dwyer family to have control."

The judge found that in fact the accrued compensation deferred by Wagner was only $20,000 ($10,000 for each of 1976 and 1977). The deferred compensation agreement, then, with a total face value of $129,000 payable over five

seem that the defendants had no understanding of their obligations as directors, officers and controlling stockholders in a closely held corporation.

Finally the defendants argue that there was an historic "corporate culture" that permitted "catch-up" pay. Obviously no "corporate culture" can justify the breach of fiduciary obligations.

years, was intended to be a deliberate diversion of corporate funds for the personal benefit of Wagner and Dwyer. The judge so found, and he was not in error in so doing.[13]

4. *The contempts.* The judge found the defendants were in violation of (i) the preliminary injunction of February 9, 1982, which restrained the company from paying Dwyer and Wagner in excess of the rate of $12,000 per person per year, and (ii) the preliminary injunction of April 23, 1982, which restrained the company from paying the attorneys' fees of the individual defendants, and restrained Dwyer and Wagner from transferring any shares of the company which each one acquired from the Nickerson estate (77 shares, Dwyer; 76 shares, Wagner).

The record is not sufficiently clear as to whether, or the extent to which, there was a violation of the February order. There is no claim that payments to Dwyer violated the order, but the judge found that "all payments called for under the deferred compensation agreement were in violation of the injunction. . . ." One difficulty is that Wagner received no salary beginning in 1983, and up to $12,000 of bona fide deferred compensation in any year might thus be allowable. (Also, as noted earlier, the judge found that Wagner had deferred $20,000 of compensation to which he was otherwise entitled.) Another difficulty is that the record is not clear whether, or to what extent, Wagner, or his widow, actually received annual payments under his deferred compensation agreement with the company. The financial statements of the company for the period ended April 30, 1987, describe payments under the agreement totalling $23,650. Neither the

---

[13]The defendants also rely on a 1975 vote of the directors (when Dwyer and Wagner were a majority of the board) which stated that additional compensation would be paid to Dwyer and Wagner "as soon as and to the extent that profits of the Corporation shall warrant it." The vote — merely a vague expression of future intent — is not an accrual of compensation earned but not paid, and it created no obligations whatsoever.

Finally the defendants argue that Wagner's deferred compensation agreement "was made possible by the one nonrecurring sales transactions in the sum of $400,000 . . . [and that] the Crowley family played no role in obtaining that large contract." This argument needs no response; see note 12, *supra.*

record on appeal, nor the exhibits in the case, include financial statements for any period after April 30, 1987. Under part 6, *Relief, infra,* we remand to the Superior Court for additional findings of fact as to the amount of improper payments under the deferred compensation agreement.

It does not appear that there was a violation of the April injunction restraining transfers of stock acquired from the Nickerson estate. Consummation of Wagner's agreement to sell all his stock (126 shares) to Dwyer was expressly suspended so long as the injunction was outstanding. Only a favorable opinion of counsel could permit performance of the agreement. The defendants' brief appears to make no mention of the matter, but there is no finding by the judge that the transfer of stock took place, and we shall assume that there was no transfer.

The judge found that $45,040.35 was wrongfully paid by the company to a law firm for the defense of the individual defendants. The finding was not clearly erroneous. The company was a nominal defendant in connection with the derivative claim and required no defense.

The judge imposed no penalties upon the defendants for his finding of contempt, nor do we. The remedy provided the plaintiff and the company, under part 6 hereof, is an entirely adequate response to the conduct of the defendants.

5. *The "freeze-out."* The judge found that Dwyer and Wagner attempted to "freeze the Crowley interest out of the benefits of its stock ownership in the Corporation." This "freeze-out," he found, consisted of (i) seizure of majority control of the company, (ii) payment of excessive compensation to themselves and their relatives, (iii) refusal to declare dividends, (iv) failure to make available the opportunity to redeem the Crowley shares on the same basis as was made available to the majority, and (v) attempting to purchase the Crowley shares at a bargain price.

Even though the defendants did not seize control of the company — as noted above, Crowley surrendered control — and even though there was no actual redemption of Wagner's stock by the company, the judge's conclusion was not clearly

erroneous. Without doubt there were excessive compensation payments to the majority; there was a persistent and deliberate failure to pay dividends (see note 11, *supra*) when the excess of compensation, had it not been wrongfully paid out to the majority, would clearly have permitted dividends; there was an admitted attempt to purchase the Crowley shares at a price which the judge found was substantially less than the value of the Wagner sales transaction; and there was a deliberate scheme, in the guise of a "deferred compensation agreement," to distribute company earnings to Wagner so that, with amounts to be paid by Dwyer, Wagner would receive a handsome price for the sale of his stock to Dwyer. In a word, the majority saw to it that their own interests were properly protected, and that the Crowley shares were made substantially worthless. The same, of course, would be true for the 50 shares owned by Lakewitz, another original stockholder.

6. *Relief.* In his final judgment the judge entered a sweeping decree: (i) the company was ordered to purchase the Crowley shares at the same price to be received by Wagner from the combination of the company and Dwyer, $1,249.90 per share, failing which Dwyer and the Wagner estate would be liable for the entire redemption price of $191,234.63, (ii) Dwyer and the Wagner estate were jointly and severally liable to Christopher Crowley, the plaintiff, in the amount of $260,141.71, with interest, representing Crowley's proportionate share (153 shares of the 456 shares outstanding) or 33.5%, of the $760,472,[14] distributed as excessive compensation; Dwyer and the Wagner estate were also jointly and severally liable to the Lakewitz estate (which as we have said, was not a party to these proceedings) in the amount of $85,730.28, with interest, representing its proportionate share (50 shares), or 11.04%, of the excessive compensation; Dwyer and the Wagner estate were to pay the plaintiff and

---

[14]We have deducted $16,070.41 from the figure appearing in the final judgment because of the judge's unintended duplication of that amount, which appears as well in his separate allowance of fees paid to the law firm representing the individual defendants.

the Lakewitz estate their proportionate shares ($15,088.51 and $4,972.47, respectively) of the $45,040.35 wrongfully paid by the company to the law firm representing the individual defendants; and finally Dwyer and the Wagner estate were to pay the plaintiff their attorneys' fees and costs in the amount of $219,904.71.

We are not in agreement with the judge's final orders. What the judge did was to bypass the plaintiff's derivative claim and provide direct relief to the plaintiff and to another minority stockholder not a party to this action. The judge evidently concluded that once having found a freeze-out, he was acting within his authority to order direct relief to minority stockholders for what are, on the facts of this case (unlawful diversions of corporate earnings), wrongs done to the corporation. See note 5 to the opinion of the court in *Bessette* v. *Bessette*, 385 Mass. at 810, cited by the judge.

We put to one side the question whether the unlawful diversion of corporate earnings to majority stockholders is a "corporate wrong" separate and apart from a "private wrong" to minority stockholders. See *Dynan* v. *Fritz*, 400 Mass. 230, 242 n.17 (suggesting that "self-aggrandizement" by majority stockholders hurts both the corporation and the minority stockholders). *Bessette* held that a direct, personal action by a minority stockholder against the majority stockholder for excessive salary payments, and payments on notes which failed for lack of consideration, must be dismissed because "the right to recover the overpayments belongs to the corporation." *Bessette* at 809. The plaintiff in *Bessette* had relied on a *Donahue* breach of fiduciary duty owed by the majority, but the court declined to follow *Donahue*, emphasizing that *Donahue* applies when "[i]t would be difficult for the plaintiff . . . to establish breach of a fiduciary duty *owed to the corporation* . . . ."[15] *Id.* at 809 (emphasis original). That is, direct relief was necessary in *Donahue* because indi-

---

[15]The trial judge in *Donahue* found that the redemption of shares from a stockholder in the majority group had been consummated in good faith and with inherent fairness; this satisfied the *Winchell* standard. See *Donahue*, 367 Mass. at 580.

rect relief through derivative claims could not succeed; in *Bessette* the derivative claims had every good reason to succeed.

It would seem, then, that *Bessette* and later cases such as *Schaeffer* v. *Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C.*, 405 Mass. 506, 513 (1989), stand for the proposition that where corporate recovery for misdeeds by a corporate fiduciary is available under traditional corporate law, and such recovery provides a just measure of relief to the complaining stockholder, resort to a direct, personal action against miscreant fiduciaries may not be available even when the acts complained of may be seen as a freeze-out scheme.[16] A finding of a "freeze-out" scheme may well be an element of a case for direct relief, but it is not necessarily sufficient to preclude the need for derivative relief.[17]

It was also error for the judge to require the company to purchase all of the stock in the company owned by the plaintiff. Quite aside from the question of the inappropriateness of direct relief in this case, Wagner's shares were to go to Dwyer, not the corporation.[18] There was no corporate redemption of Wagner's shares in fact, nor was any intended,

---

[16]Contrast *Donahue*, a redemption case, where the findings of the trial judge — a redemption in good faith and with inherent fairness — precluded recovery by the corporation; and contrast *Wilkes*, 372 Mass. at 852-853, an employment termination case, where there was no wrong done to the corporation. See *Goode* v. *Ryan*, 397 Mass. 85, 89 (1986).

[17]The rule of corporate recovery for wrongs to the corporation may not be inflexible. See *Samia* v. *Central Oil Co.*, 339 Mass. 101, 123 (1959), where Justice Cutter wrote that direct relief to the complaining shareholder was permitted in order "more justly [to] apportion the burden of the recovery among the wrongdoers." In this case a just result is achieved by requiring the wrongdoers to return to the company all funds, with interest, they improperly withdrew, followed by the redistribution of those funds, after payment of fees, to all the stockholders. The fact that the wrongdoers will participate proportionately in that dividend distribution does not argue for a different result. See *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow*, 203 Mass. 159, 193-194 (1909).

[18]*Donahue* expressly disclaimed the application of the principles announced in that decision to share transactions not involving the corporation. *Id.* at 593, note 18.

and we see no sound reason for treating the transaction as though it were, or might be, a redemption.[19]

The plaintiff has alleged and proved the essential elements of a derivative action.[20] See Mass.R.Civ.P. 23.1, 365 Mass. 768 (1974). Obviously demands for corrective action made upon the directors and controlling shareholders would have been futile. See *S. Solomont & Sons Trust, Inc.* v. *New England Theatres Operating Corp.*, 326 Mass. 99, 113 (1950). We are in a position, then, to fashion relief which is consistent both with the thrust of the relief ordered by the judge and with the rule of *Bessette*.

*First*, Dwyer and the Wagner estate, as directors and controlling stockholders who acted in concert throughout the relevant period, see *Sagalyn* v. *Meekins, Packard & Wheat, Inc.*, 290 Mass. 434, 438-439 (1935), are jointly and severally liable to the corporation, see *Chelsea Indus., Inc.* v. *Gaffney*, 389 Mass. 1, 16 (1983), for (i) the total amount of all excessive compensation payments, $760,472, and (ii) the amount of $45,040.35 wrongfully paid by the company for the defense of the individual defendants, all with interest at the legal rate from the date of the entry of the complaint, January 6, 1982. *Id.* at 17 n.22. See *Sugarman* v. *Sugarman*, 797 F.2d at 13.

*Second*, the deferred compensation agreement dated April 8, 1983, between the company and Wagner is null and void to the extent it exceeds $20,000 (Wagner's total compensation for 1976 and 1977 which the judge found was voluntarily deferred by Wagner), and the Wagner estate and Dwyer are jointly and severally liable to the company for all payments received by Wagner under that agreement which exceed $20,000, with interest at the legal rate from the date of each payment (which would be after the commencement of this action). Because the record is incomplete with regard to

---

[19]The record appears to be silent as to whether there was a vote of the directors waiving restrictions on transfer on the Wagner to Dwyer sale.

[20]While all the pleadings are not before us, it does not appear that the plaintiff signed his third amended complaint under oath as required by Mass.R.Civ.P. 23.1. However, the defendants did not object, and the necessary allegations were verified under oath at the trial.

the total amount of such payments, we must remand the case to the Superior Court for findings in that regard.

*Third*, because we now provide relief in the fashion of a derivative action — a fund of money created for the benefit of all the stockholders in the company — an award of attorneys' fees to the plaintiff out of that fund is appropriate.[21] See *Coggins* v. *New England Patriots Football Club, Inc.*, 406 Mass. 666, 669 (1990); *Martin* v. *F.S. Payne Co.*, 409 Mass. 753, 758 (1991). The judge allowed the sum of $219,904.71 for fees and costs, and given the fact that the fund will, with interest, exceed one million dollars, as well as the fact that the attorneys accepted the case on a contingent basis, we confirm that award *payable from the fund* as reasonable.[22] See *Coggins, supra* at 669 n.6. See Principles of Corporate Governance: Analysis and Recommendations § 7.18 comment a (Tent. Draft No. 10, 1990).

*Fourth*, subject to the considerations outlined below, the balance of the fund to be returned to the company by Dwyer and the estate of Wagner, after deducting attorneys' fees and costs, is to be paid by the company as a dividend to all the stockholders. "Equitable considerations are relevant in derivative stockholder actions . . . [and they] are most appropriate in dealing with relationships among stockholders in close corporations." *Martin* v. *F.S. Payne Co., supra* at 760 (award of counsel fees in the absence of a cash fund). Here the majority have demonstrated that the funds they withdrew from the company were not required for working capital, debt service, or any other customary business need. Excess cash funds not required for the security of the enterprise or to conduct its business may be appropriate for distribution as

---

[21]The parties briefed the question whether the plaintiff was entitled to attorneys' fees in a freeze-out case where direct relief is ordered. See *Sugarman* v. *Sugarman*, 797 F.2d 3, 15-16 (1st Cir. 1986). That issue has become moot under our disposition of the case.

[22]The judge ordered payment of the fee award by Dwyer and Wagner. Even if that were an appropriate order in a case of direct stockholder relief under *Donahue*, as to which we express no opinion, it is not appropriate in the context of the relief as fashioned by this court. We also note that the defendants have made no challenge to the *amount* of the fee award.

a dividend. On the facts of this case a dividend distribution would be more than appropriate. The Crowley and Lakewitz interests have been frozen out of the benefits of this business for more than a decade; they are now entitled to participate in the favorable results of operations to the extent that those results have been wrongly appropriated by the majority. The failure to pay dividends has not been in good faith, there has been a "plain violation of the rights of stockholders," and an order requiring a dividend distribution of the amount wrongfully withheld by those in control is required to right the wrong that has been done. See *Anderson* v. *Bean*, 272 Mass. 432, 444 (1930); *Crocker* v. *Waltham Watch Co.*, 315 Mass. 397, 402 (1944); *Hallahan* v. *Haltom Corp.*, 7 Mass. App. Ct. 68, 71 (1979) ("A court exercising traditional equity powers has power to remedy the wrong complained of and to make the decree effective").

Nevertheless, almost three years have passed since the judge's rulings and order for judgment, and the financial information in the record is stale. Rights of creditors may have intervened, and this could include the Internal Revenue Service which may have an interest in the funds to be returned to the company as excessive compensation. These considerations may argue for a dividend that is less than the amount recovered. Further findings in this regard are required, on the basis of which the judge will determine the magnitude of the mandatory dividend order.

This case is remanded to the Superior Court to determine the amount of the payments to Wagner's estate and his surviving widow, the appropriate amount of the dividend to stockholders, and for the entry of a final judgment as set forth in the paragraphs of this opinion titled First, Second, Third, and Fourth under the caption "Relief."

*So ordered.*