van Gestel, J.
This matter is before the Court, after a jury-waived trial, for findings of fact, rulings of law and an order for judgment.
FINDINGS OF FACT
In 1993, Mark Khayter (“Khayter”), Robert F. Goulart (“Goulart”) and Dennis J. Leslie (“Leslie”) entered into a simple partnership known as Boston Software Collaborative. Shortly thereafter, in September of 1994, the partnership business was incorporated in Massachusetts as Boston Software Collaborative, Inc. (“BSC”). BSC remains a corporation today.
When the partnership was established, Khayter, Goulart and Leslie each contributed $200 as start-up money.
From its inception to at least April 26, 2000, Leslie was an employee of BSC. Until June 12, 2000, he held the positions of treasurer and a director, and he at all times has been an approximately one-third shareholder.
Khayter at all times has been the president and chief executive officer of BSC, and at all times has been a director and an approximately one-third shareholder.
Goulart at all times has been the clerk of BSC, and he assumed the role of treasurer in June of 2000. He also at all times has been a director and an approximately one-third shareholder.
For tax purposes, BSC has elected to be treated as an S Corporation.
The corporate records for BSC are casual and somewhat incomplete. It is unclear, for example, whether any by-laws were ever formally adopted, although an unsigned version of a common form of by-laws — with the place for the name of the corporation to which they apply left blank — was proffered by the defendants over objection. Also, a reading of the minutes of shareholders’ and directors’ meetings exhibits a somewhat simplistic approách. The minutes seem more like notes of a club meeting than the formalized recording of corporate action.
Even the exact number of shares outstanding and the identity of all the shareholders is not without its uncertainty. In addition to Khayter, Goulart and Leslie, it appears that at least one other person, named Michael Bronshvayg (“Bronshvayg”), owns an inconsequentially small number of shares, and there is the possibility that a man named J. Houghton (“Houghton”) may also own a still smaller number of shares. Both Bronshvayg and Houghton are employees of BSC, but not directors or officers.
BSC, in any event, is and always has been a closely-held corporation. It has a small number of shareholders, with Khayter, Goulart and Leslie each holding nearly one-third of the shares, and collectively holding in excess of 97% of all outstanding shares; there is no ready market for the BSC stock; and there is substantial majority shareholder participation in the management, direction and operations of the corporation. All of the shareholders, at least until Leslie’s termination in June of2000, were employees; and Khayter, Goulart and Leslie were, until that same time, the only directors.
Each of Khayter, Goulart and Leslie brought different skills and talents to BSC. All three were software engineers, of apparently somewhat different technical skills. Khayter seems to be the most technically proficient; Goulart’s abilities are best expressed in the marketing area; and Leslie had an appetite, and some skills, for administrative and office management functions. Thus, at the start at least, they complemented each other for the general benefit of the business.
The method of compensation of the three principals created friction as the company grew. The nature of the product BSC provides is technical services in software engineering by its employees, including the principals, and by independent consultants to outside customers in need of such services for special projects. Clients, for the most part, are billed on hourly rates, and much of the work is performed physically at client sites. The analogy to a small- or medium-sized lawfirm is apt in many respects.
Up until early 1999, the great bulk of the compensation for the principals was allocated based upon the billings for their services. Since Leslie was doing more of the administrative and management work in the office, this scheme tended to put Leslie at the low end of the compensation ladder because office work did not result in billable hours. For example, the salaries and other compensation, not counting “distributions” which were equal for each principal, for the period from fiscal 1995[2] through fiscal 1998,[3] were as follows:
Fiscal 1995 Fiscal 1996 Fiscal 1997 Fiscal 1998
Khayter $160,052 $148,195 $264,618 $151,180
Goulart $171.990 $190,904 $265,785 $224,000
Leslie $50,091 $144,382 $163,793 $103,338
Each of the principals received equal “distributions”[4] in each of the fiscal years from 1995 through 1999 in the following amounts: 1995 — $60,000; 1996 — $80,000; 1997 — $89,280; 1998 — $47,500; and 1999 — $62,000.
*381 For the fiscal years from 1995 through 1998, the principals averaged per year the following numbers of billable hours charged to clients: Khayter — 2,065; Goulart — 2036; and Leslie — 876.
Again, over the four fiscal years from 1995 through 1998, the total revenues brought to BSC on time and materials billing for each of the three principals were: Khayter — $788,497; Goulart — $889,565; and Leslie— $296,749.
In late 1998, there was a possibility of selling BSC. At about that time, the principals agreed to change to a compensation scheme that essentially equalized their total compensation without reference to billable hours, as well as their distribution. Under this plan each of the principals was to be paid at a rate of about $157,000 per year, before any distributions. Khayter and Goulart insist that this plan was only to stay in effect for about six months until the company was sold. Leslie disagrees. In any event, the plan was still in operation until the spring of 2000, and Leslie never did agree to change it.
Friction began to emerge between Leslie, on the one hand, and Khayter and Goulart, on the other. There were issues over compensation, technical proficiency, economic contributions, employee dissatisfaction and customer complaints. Essentially, Leslie felt under-compensated because he contributed more to the non-billable, office administration end of the business. Khayter and Goulart felt that they worked harder, billed more and were technically much more proficient that Leslie and, therefore, were properly compensated at a higher level.
Credible examples of complaints about Leslie from employees and customers were presented. For the most part, at least on an incident-by-incident basis, these were not matters of the magnitude that would ordinarily be seen as a justification for terminating a partner in a partnership or a shareholder in a closely held corporation.
For example, a number of employees complained that Leslie spent too much time working on personal matters while at the office, particularly emphasizing the work he did when he was in the process of building a new home in New Hampshire. Also, Leslie has an obviously brusque approach that employees found unpleasant. Some said he swore too much or at inappropriate times, and others reported on crude ethnic slurs that he tended to use.
One young employee was critical of Leslie’s direction to her that she should not wear farmer-type overalls to work because “she looked like a New Hampshire hick.” She was from New Hampshire. This same employee was upset that Leslie moved her desk because, he said, she was talking too much to fellow workers and was a distraction. Again from this employee, there was recited an occasion when Leslie, while driving her to a train station, first pleasantly reported to her about a raise in paj' and then burst into a profanity-laced discourse about the company and another employee in particular. She felt intimidated and when she arrived home telephoned Goulart, asking for assistance.
In the late fall of 1999, three key employees threatened to quit BSC because of their concerns about working with Leslie or in a company run by him. They did not quit after discussing the matter with Goulart and receiving additional compensation.
There was a complaint in April 2000, revealed in a series of e-mails[5] with one employee, about the timing of deposits into employees’ 401(k) plans. Leslie’s response to a fairly innocuous question was:
Who the hell do you think your [sic] talking too [sic]! First of all don’t take that tone of an e-mail with me ... I have been administering the 401k for years and no one, not even you gets to talk to me in this manner. Your [sic] god damn money, was sent out with everyone else’s and if they haven’t credited into your account we will look into it and find out what the issue is. If your [sic] having a bad day, get over it . . . Don’t ever send me another e-mail like this again.
The customer complaints were generally in the nature of observations that Leslie was being billed as a senior software engineer but did not demonstrate commensurate skills, that his work took too much time to complete or was such that the customers did not want him to be assigned to their projects.
As noted above, by the end of 1999, the company not having been sold, Khayter and Goulart were anxious to return to the former time-and-materials, hourly billing method of compensation, and Leslie resisted. Finally, Khayter instructed Leslie to direct the office manager to make the change. Leslie, however, did not follow those instructions.
Leslie, in the spring of 2000, had been confiding many of his concerns about the company, its financial affairs and its future to Donald Follansbee (“Follansbee”), the new head of marketing for BSC. Near the end of April 2000, Leslie had told Follansbee of the possibility that he might leave the company. Apparently, on the evening of April 25, 2000, Leslie and his wife talked extensively about his future with BSC, and Leslie remained up the entire night considering the situation. Then, at 7:07 a.m. on April 26, 2000, Leslie sent an e-mail to Follansbee that read as follows:
Your [sic] Stuck With Me . . .
After all that aggravation I have to go through, my wife insists that I stay.
She reserves the right to shoot Bob and (or) Mark at a moments [sic] notice or at a minimum to severely injure them for what they are putting her through.
*382 But they are not going to take my vacation without a fight.
Later that day, Follansbee sent an e-mail to Khayter and Goulart that included Leslie’s e-mail to him. Follansbee's e-mail read:
I received this message this morning and wanted to forward it on to you. As we discussed last night I will plan to be at BSC all day on Friday. I have not sent this message through the BSC server. Millennium and Mediaone were used. I have also switched off my BSC phone because I have several messages already from Dennis and I really do not want to get into a discussion over this.
Khayter and Goulart made a joint telephone call to Leslie late in the day on April 26, 2000. They advised Leslie that he was being put on unpaid leave, that he should not come to the BSC offices, that he should not communicate with BSC personnel, and that he should appear at the offices of Palmer & Dodge, the company’s counsel, on Friday, April 28, 2000, for a meeting to discuss the situation. They also told Leslie not to bring his gun to the meeting.
Leslie had a permit to carry a firearm and apparently did so from time to time. On one occasion, for example, when BSC was located at 294 Washington Street in Boston, Leslie had to go over to the post office in Post Office Square. Because he could not bring his gun with him, he put it in the drawer of the woman then acting as office manager. She protested that it made her nervous to have the gun there, but he declined to remove it.
Khayter and Goulart were concerned about the shooting threat in Leslie’s April 26, 2000 e-mail to Follansbee. Leslie claims it was a “joke” and, in any event, he did not expect Follansbee to forward the e-mail on to anyone. Khayter and Goulart considered the shooting threat to be the final step in an expanding deterioration of their relationship with Leslie and, thus, put him on unpaid leave.
At the meeting at Palmer & Dodge on April 28,2000, only the three principals were present. No lawyers were included in the conversation. Khayter and Goulart presented Leslie with a document, prepared by a Palmer & Dodge lawyer, entitled “Separation Agreement and Release.” In essence, the document, in return for Leslie’s termination of employment with BSC and a release of all claims against it, offered Leslie: severance of 10 weeks pay, or less if he got another job before that; a relationship with BSC in a consulting capacity if BSC chose to do so; the possibility that BSC “may attempt” to locate and provide contract opportunities for Leslie; payment of his accumulated vacation time at his current hourly rate; and continuance of his medical insurance at least until December 31,2000. Leslie did not accept the proposal.
A modified proposal, not significantly more generous in terms, was later tendered by Khayter and Goulart and also not accepted by Leslie.
On June 6, 2000, Leslie received notice of a June 12, 2000 shareholders meeting to take place at Palmer & Dodge. The purpose for the meeting was said to be: (1) the removal of Leslie as the company’s 401(k) trustee; (2) the appointment of Goulart as the company’s 401(k) trustee; and (3) the removal of Leslie as a director of BSC. A proxy accompanied the notice.
Leslie did not attend the shareholders’ meeting, but he did send in his proxy, which he signed and dated June 8, 2000. In his proxy, Leslie voted in favor of his own removal as the company’s 401(k) trustee and the appointment of Goulart to take over that position. He voted against his removal from the board of directors. The minutes of the meeting reflect that the first two questions — Leslie’s removal and Goulart’s appointment as 401(k) trustee — carried with 276,000 in favor and 24,000 abstaining.[6] The vote to remove Leslie as a director carried with 184,000 in favor, 92,000 against and 24,000 abstaining.
The shareholders’ meeting minutes recite that the meeting lasted five minutes, beginning at 4:15 p.m. and adjourning at 4:20 p.m.
Also on June 12, 2000, there was a BSC directors meeting. Leslie, however, never received notice of that meeting. Its minutes recite that the meeting lasted for 10 minutes, beginning at 4:00 p.m. and adjourning at 4:10 p.m. Leslie, thus, was still a director as of the time of, and throughout, this meeting.
There were two items voted on at the directors meeting: (1) to remove Leslie as treasurer of BSC; and (2) to appoint Goulart as treasurer. Khayter and Goulart each are recorded as voting in favor, and Leslie, who was not there, is designated as “Abstained (not present).”
Leslie, aside from a distribution of $62,000 for fiscal year 1999, and being paid for his accumulated vacation, has received no further compensation payments from BSC since his termination, and no dividends or other distributions have been paid to him since that time.
Although he is said to be unemployed currently, Leslie earned between $190,000 and $230,000 in software consulting income since June of 2000.
Shortly after Leslie was terminated at BSC, Khayter and Goulart increased their personal compensation by almost the amount previously being paid in compensation to Leslie. As a result, they each started earning at a rate of approximately $240,000 per year. Also in September 2000, Khayter and Goulart, for the first time, included themselves in the employee bonus plan. As a result, they each received an additional $45,000. They also, like Leslie, cashed out their accumulated vacation pay.
*383 There have been no further “distributions” since those made in fiscal year 1999, and the company now appears to be experiencing a time of reduced income and profits because of the current economic slowdown.
Leslie complains that, in addition to the foregoing and despite the tempered economic conditions, Khayter and Goulart are mismanaging the BSC business. He cites four things in particular: (1) raises given to certain employees; (2) expenditures to establish a presence in the Atlanta, Georgia market; (3) increasing employee benefits to give them short- and long-term disability, life insurance and dental care; and (4) moving the BSC offices from 31 Milk Street to 50 Congress Street in Boston.
Leslie also claims that the compensation currently being paid to Khayter and Goulart is excessive. On this latter point, BSC presented an expert witness skilled in assessing and advising on competitiveness and fairness in executive compensation. The Court found that while the expert was fully qualified, his testimony was of only moderate assistance because, mostly, what he did was examine information from outside website data bases, particularly that of an entity called the Economic Research Institute or “ERL” The data base of ERI seems thorough and extensive. It suggests — and the expert’s additional research seems to corroborate — that Khatyer’s and Goulart’s current compensation falls within the mid-point to slightly higher than the mid-point of executives performing their kind of work for companies of BSC’s size and earnings.
Additionally, the Court observes Leslie’s August 4, 2000 e-mail in which he recommended that Follansbee be made CEO and compensated at a rate that ultimately would be higher than that now being paid to Khayter and Goulart.
Standing alone, Khayter’s and Goulart’s compensation is reasonable, and the Court so finds.
The Complaint is structured somewhat differently from the norm. It has two sections: one is designated Direct Action; the other is called Derivative Action. Nothing is called a “count.”
In the Direct Action section, Leslie, on his own behalf, charges the defendants with: A — failure to pay dividends; B — wrongful termination; and C — freeze-out.
In the Derivative Action section, Leslie complains and seeks judgment derivatively in favor of BSC against Khayter and Goulart for waste of corporate assets and breach of fiduciary duty.
RULINGS OF LAW
BSC is a close corporation established under the laws of the Commonwealth. Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 586 (1975). It is ‘typified by: (1) a small number of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction and operations of the corporation.” Id.
Thus, BSC “bears a striking resemblance to a partnership.” id.
Just as in a partnership, the relationship among the stockholders must be one of trust, confidence and absolute loyalty if the enterprise is to succeed ... All participants rely on the fidelity and abilities of those stockholders who hold office. Disloyalty and self-seeking conduct on the part of any stockholder will engender bickering, corporate stalemates, and, perhaps, efforts to achieve dissolution.
Id. at 587.
Although the corporate form provides . . . advantages for the stockholders (limited liability, perpetuity, and so forth), it also supplies an opportunity for the majority stockholders to oppress or disadvantage minority stockholders. The minority is vulnerable to a variety of oppressive devices, termed “freeze-outs,” which the majority may employ . . . An authoritative study of such "freeze-outs” enumerates some of the possibilities: “The squeezers [those who employ the freeze-out techniques] may refuse to declare dividends; they may drain off the corporation’s earnings in the form of exorbitant salaries and bonuses to the majority shareholder-officers and perhaps their relatives, or in the form of high rent by the corporation for property leased from majority shareholders . . .; they may deprive minority shareholders of corporate offices and of employment with the company; they may cause the corporation to sell its assets at an inadequate price to the majority shareholders . . .’’In particular, the power of the board of directors, controlled by the majority, to declare or withhold dividends and to deny the minority employment is easily converted to a device to disadvantage minority stockholders.
Id. at 588-89.
Leslie, here, finds himself in the position of a frozen-out minority shareholder. He is “cut off from all corporation-related revenues [and] must either suffer [his] losses or seek a buyer for [his] shares .. . [He].. . anticipated that his salary from his position with the corporation would be his livelihood. Thus, he cannot afford to wait passively.” Id at 591.
Because of the fundamental resemblance of the close corporation to the partnership, the trust and confidence which are essential to this scale and manner of the enterprise, and the inherent danger to the minority interests in the close corporation, . . . stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another . . . [T]he standard of duty owed by partners to one another [is that of] the “utmost good faith and loyalty.” . . . Stockholders in close corpo *384 rations must discharge their management and stockholder responsibilities in conformity with this strict good faith standard. They must not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation.
Id. at 592-93.
Despite the foregoing, the duties placed on shareholders in a close corporation are not meant to impose a straitjacket on legitimate corporate activity. Zimmerman v. Bogoff, 402 Mass. 650, 657 (1988). The fiduciary duty imposed does not limit “legitimate action by the controlling group in a close corporation" that is taken to manage the corporation “in the best interests of all concerned.” Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 851 (1976); Merola v. Exergen Corp., 423 Mass. 461, 465 (1996).
“The controlling group in a close corporation must have some room to maneuver in establishing the business policy of the corporation.” Wilkes, 370 Mass. at 851. This Court must, therefore, carefully analyze the action taken by Khayter and Goulart in this case. The overriding question to be determined is “whether the[y]. . . can demonstrate a legitimate business purpose for [their] action.” Id. In this regard, Khayter and Goulart “must have a large measure of discretion, for example, in declaring or withholding dividends, . . . establishing the salaries of corporate officers, dismissing directors with or without cause, and hiring and firing corporate employees.” Id. See also, Merola, 423 Mass. at 464.
“When an asserted business purpose for their action is advanced by the majority, ... it is open to the minority ... to demonstrate that the same legitimate objective could have been achieved through an alternative course of action less harmful to the minority’s interest." Wilkes, 370 Mass. at 851-52. See also Zimmerman, 402 Mass. at 657. This Court must, therefore, “weigh the legitimate business purpose, if any, against the practicability of a less harmful alternative.” Wilkes, 370 Mass. at 852.
Direct Action
Here, the majority — Khayter and Goulart — terminated Leslie’s employment, removed him as company treasurer, voted him off the board of directors and since have paid him no dividends or distributions. Leslie was hardly a model employee. At the same time, as a founder and a nearly one-third minority shareholder, he was entitled to the utmost good faith and fair dealing. That he did not receive.
With an ordinary employee, not entitled to partner-like treatment, the termination of Leslie was justified. Given Leslie’s enhanced status as an owner, however, Khayter and Goulart did not act in a manner demonstrating the utmost good faith.
In any event, to this Court, after weighing the situation, there appear to have been less harmful alternatives open to Khayter and Goulart than the blunt course they followed. For example, Leslie’s administrative functions could have been modified such that he could have been insulated from direct contact with the BSC employees by using Follansbee as the intermediary. Leslie could have been encouraged— and assisted — in becoming more extensively involved in off-site, time-and-materials billing projects. He could have been directed to take courses and training to upgrade his technicál skills. Other incentives through the use of creative compensation techniques could have been explored. Clearly, there was no demonstrated need to force him off the board of directors and thereby cut off his access and knowledge about the day-to-day affairs of the company. In short, Khayter and Goulart did not have to so completely, fully and abruptly bring Leslie’s participation to a complete halt without first making a serious attempt to solve the problem in other ways.
The resolution proposed at the Palmer & Dodge meeting on April 28, 2000, can hardly be seen as a serious effort to resolve a complex corporate issue among people who were duty bound to treat each other as partners. Ten weeks’ severance pay, some accrued vacation, and a non-binding suggestion of the possibility of getting some work as a consultant in return for total termination of employment and a general release do not fit any reasonable definition of acting with the “utmost good faith and loyalty” by Khayter and Goulart to their “partner,” Leslie.
“Equitable remedies are flexible tools to be applied with a focus on fairness and justice.” Demoulas v. Demoulas, 428 Mass. 555, 580 (1998).
What then is appropriate by way of an equitable solution for Leslie? Even he, in his opposition to a motion in limine to exclude expert valuation testimony, concedes that returning him to his former position at BSC is not a desirable remedy. He said in that opposition: “This forced continuance of the corporate marriage would most likely result in future litigation such that it is not a remedy that will resolve the damage done nor prevent further similar damage in the future.”
At the same time, the case law does not support, nor does this Court think it a proper equitable resolution on the facts presented, a compelled buy-out of Leslie’s shares by BSC or Khayter and Goulart at some artificially determined value. Here, unlike in Demoulas, 428 Mass. 555, or Crowley v. Communications for Hospitals, Inc., 30 Mass.App.Ct. 751 (1991), none of the stockholders has received any monetary benefit from the purchase or sale of their shares.
Leslie’s participation as an employee is, like the fallen egg, broken beyond repair. His return to BSC, as such, would not be in the best interest of the corporation or any of its shareholders, including Leslie himself.
*385 In exercising its “broad powers to determine the appropriate relief ‘to remedy the wrong complained of and make the [judgment] effective,’ ” Demoulas, 428 Mass. at 591, three things need attention by the Court: (1) fair compensation to Leslie for his loss of employment; (2) fair compensation to Leslie for any amounts received by Khayter and Goulart in the nature of a dividend; and (3) provision for Leslie, for so long as he remains a shareholder, to be able to monitor the management of BSC and participate in the returns to shareholders, without interfering unduly therein.
Because Leslie’s reinstatement as an employee is unworkable, he is entitled to a fair severance award. In assaying what is fair, the Court has considered what he was making by way of compensation as an employee when terminated, as well as the $190,000 to $230,000 he made in the period following June 2000. Under all of the circumstances, this Court considers and awards severance for the period from May 1, 2000 through December 31, 2000, at Leslie’s annual rate of $157,000 per year, which here amounts to $104,667.
Additionally, this Court concludes that the $45,000 “employee bonus” payments that Khayter and Goulart awarded themselves at the end of fiscal 1999, are nothing more than distributions or dividends of the kind previously made to shareholders. Consequently, Leslie is entitled to an equal payment of $45,000.
Also, hereafter any payments made to Khayter or Goulart that are not the functional equivalent of salary for work actually performed, as opposed to net profits of BSC, and exclusive of reasonable payments in lieu of vacation and reasonable benefits, should be made in an equal amount, and at the same time, to Leslie.
Finally, Leslie should be reinstated as a full voting member of the BSC board of directors so that he may be as fully aware as that position reasonably permits about the management and operation of BSC, and so that he may constructively participate in that management insofar as a director may properly do so.
It is to be observed that none of the foregoing is meant to compel the payment of any dividends by BSC. The directors of the corporation retain their wide discretion with regard to the decision whether to declare any dividends at all, as well as the amount of any such dividends. Crocker v. Waltham Watch Co., 315 Mass. 397, 402-03 (1944). What must not be done is to make payments only to the maj ority shareholders, payments having different names or styles but being in reality dividends.
Derivative Action
Particularly when examining the derivative claims, directed as they are against things done by Khayter and Goulart in running BSC, and with regard to their own remuneration after Leslie was terminated, the Court must be cognizant of and deferential to the business judgment of the participants. It is primarily only when Khayter and Goulart are seen to be doing things that directly benefit themselves that the more close examination comes into play.
This Court rules that there was nothing inappropriate in the actions of Khayter or Goulart in any of the following: granting raises in pay for employees other than themselves; assisting in the establishment of a business presence in Atlanta, Georgia; providing additional employee benefits in the form of short- and long-term disability, life insurance and dental coverage; and causing the Boston office to move, at identical square-foot rental costs, from grossly overcrowded space at 31 Milk Street to somewhat more ample space at 50 Congress Street, Boston. Each of these actions fell well inside that context of appropriate business judgments to which this Court should not be a party. See, e.g.,Harhen v. Brown, 431 Mass. 838, 848 (2000); Spiegel v. Beacon Participations, Inc., 297 Mass. 398, 433 (1937).
Finally, the Court turns to the compensation increase that Khayter and Goulart gave to themselves following Leslie's termination. As noted above, effectively they took the $ 15 7,000 being paid to Leslie when all three were on the equal compensation plan and split it between the two of them, thereby raising their base compensation from $157,000 to a rounded-up $240,000. Since in doing so they were dealing with themselves and for their own personal benefit, vigorous scrutiny is required. Coggins v. New England Patriots Football Club, Inc., 397 Mass. 525, 531 (1986); American Discount Corporation v. Kaitz, 348 Mass. 706, 711 (1965); Crowley, 30 Mass.App.Ct. at 756.
Reasonable compensation for corporate officers is a question of fact. Crowley, 30 Mass.App.Ct. at 756. Here, like in Crowley, the Court had the benefit of outside expert opinion to the effect that Khayter’s and Goulart’s compensation, as increased, is reasonable. See Black v. Parker Mfg. Co., 329 Mass. 105, 116-17 (1952). Additionally, the Court had Leslie’s own suggestion of fair compensation for Follansbee if promoted, as Leslie urged even after his termination, to chief executive officer of BSC. Follansbee would have been paid at more than either Khayter or Goulart. Lastly, the Court considered what Khayter and Goulart were earning before the 1999 change to equal compensation for each of the three founders— amounts that Leslie, at the time, never complained about because of their girth.
All of the foregoing on the compensation issue enables the Court to rule that Khayter and Goulart have met their burden and withstood the vigorous scrutiny regarding their compensation. It is fair and reasonable, and it will not be altered by this Court.
Since the Court finds no basis for relief on the derivative claims, it awards no attorneys fees or expenses. See, e.g., Dynan v. Fritz, 400 Mass. 230, 247 (1987).
*386 ORDER FOR JUDGMENT
Based upon the foregoing findings of fact and rulings of law, the Court ORDERS the entry of judgment in favor of the plaintiff Dennis J. Leslie, individually, against Boston Software Collaborative, Inc. only, in the amount of $149,667, together with costs and interest at the statutory rate from May 1, 2000.
The Court further ORDERS judgment against ali defendants: that hereafter, for so long as Dennis F. Leslie remains a shareholder, any payments made to Mark Khayter or Robert F. Goulart that are not the functional equivalent of compensation for work actually performed, as opposed to net profits of Boston Software Collaborative, Inc., and exclusive of reasonable payments in lieu of vacations and reasonable benefits, shall be made in an equal amount, and at the same time, to Dennis J. Leslie; and that Dennis J. Leslie shall be reinstated forthwith as a member of the Board of Directors of Boston Software Collaborative, Inc.
Judgment shall be entered for the defendants dismissing all of the derivative claims brought by Dennis J. Leslie on behalf of Boston Software Collaborative, Inc.
Further, the Court determines that there is no need or basis for considering any evidence of the bifurcated issue relating to the valuation of Boston Software Collaborative, Inc. and, consequently, the judgment ordered above shall be a final judgment in this case.

 BSC’s fiscal year ran from October 1 through September 30. Thus, fiscal 1995 ran from October 1, 1995 through September 30, 1996.

 The Court has not included fiscal 1999 because there was a change in the compensation method part way through that fiscal year and, consequently, the comparisons are not of assistance for the point being illustrated here.

 It is not wholly clear what the “distributions” were intended to be. They were called different things by each principal. They seem somewhat like distributions of year-end profits in a partnership, although they were not always paid just at year-end; or they may be like dividends in a corporation.

 The Court observes the ubiquitousness of the e-mail in modern communication, particularly among the technically proficient. The parties at BSC seemed to use the e-mail for almost every type of communication. This, of course, left a revealing, and oftentimes embarrassing, paper trail.

 The owner(s) of the 24,000 shares abstaining was, or were, not identified. The Court assumes, however, that the owners of the 276,000 shares voting were Khayter. Goulart and Leslie.