Neel, J.
Plaintiffs, minority stockholders of Vital Technologies, Inc., a close corporation (“Vital”), bring this direct action against defendants, the majority stockholders, for breach of fiduciary duty. Vital, and the business ventures which succeeded it, were organized to develop and market tests for detection of certain cancer-causing toxins in food and grains. Plaintiffs claim that in two separate transactions (a stock issuance to defendants on January 27, 1986, and a corporate reorganization in November 1987), defendants wrongfully diluted the plaintiffs’ equity in Vital and in the business venture comprising Vital’s principal asset.
The case was tried without jury. For the reasons set forth below, the Court finds for defendants as to the claims based on the January 27, 1986 issuance of stock, for the plaintiffs as to the claim based on the November, 1987 reorganization, and orders that the plaintiffs’ equity interests be restored by means of a transfer by defendants to plaintiffs of a specified number of shares of Vital.[3]
FINDINGS OF FACT
On the basis of the credible evidence and inferences reasonably drawn therefrom, I make the following findings.
1. The Parties
Defendants are scientists who have participated, from the founding of Vital or soon thereafter, in the research and development of various products in the fields of food, agriculture and veterinary science. Each defendant is and has been a stockholder of Vital, in varying amounts as set forth below; at various times, each was also a director of Vital.
Defendant Dr. David Livingston’s (“Livingston”) areas of concentration are microbiology, molecular biology, cell biology, medicine and immunology. His scientific research has focused on the development of cancer in cells. Livingston has been a member of the Harvard faculty since 1973. He is the Emil Frei professor of medicine at Harvard Medical School, the former Chairman of the Department of Medicine at the Dana-Farber Cancer Institute and the current Chairman of the Executive Committee for Research at DanaFarber. He serves as Chairman of the Review Committee of the National Cancer Institute and in 1995 was elected to the National Academy of Sciences.
Defendant Dr. Thomas Benjamin’s (“Benjamin”) areas of concentration are cell biology, microbiology, molecular biology, genetics, immunology, biochemistry and recombinant DNA technology. He has been a researcher at the Pasteur Institute of Paris, the Salk Institute, the Institute for Biomedical Research in Chicago and the Public Health Research Institute in New York. Benjamin has been a professor of pathology at the Harvard Medical School since 1973. He is an Investigator of the National Cancer Institute and has authored almost one hundred peer review publications.
Defendant Dr. Gerald Wogan (“Wogan”) is one of the founders of the discipline of toxicology. His areas of concentration are toxicology, food technology, industrial en2ymology and the biochemistry of nucleic acids, *701 enzymes and naturally occurring toxins in small molecules. He is a leading authority on the carcinogenesis of aflatoxins, a form of mycotoxin.[4] Wogan was the first scientist to identify and separate aflatoxin in its pure form. Along with a colleague at Massachusetts Institute of Technology, he also determined aflatoxin’s chemical structure. Wogan is the Underwood-Prescott professor of nutrition and food science at MIT and is the Director of the Division of Toxicology. He has authored more than three hundred peer review publications and in 1977 was elected to the National Academy of Sciences. He is one of the world’s foremost authorities on aflatoxins and their mechanisms of action.
Defendant Dr. Steven Tannenbaum (“Tannenbaum’') concentrates in the areas of toxicology, biochemistry, food chemistry and food technology. He is a professor of chemistry and toxicology at MIT. Since the mid-1970s, Tannenbaum has been a consultant to the food industry. He has authored more than three hundred publications on carcinogenesis and food chemistry.
Defendant Dr. John Groopman (“Groopman”) concentrates in the areas of environmental health, toxicology and carcinogenesis. He has been a professor in environmental sciences at Johns Hopkins University since 1989. Presently, he is Chairman of the Department of Environmental Health Sciences at Johns Hopkins University and is the Anna M. Baetjer professor of environmental health, a professor of oncology and the Deputy Director of the Oncology Center at Johns Hopkins School of Medicine.
Plaintiff Bernard S. Horton (“Horton”) was acting chief-executive of Vital from May 1, 1983 to January 22, 1984. From January 23, 1984 until February 4, 1985, he was President and Treasurer of Vital. He also served as a member of the board of directors of Vital from January 23, 1984, until his resignation on December 18,1985. Horton is the owner of 17,000 shares of common stock of Vital. Prior to, during and following his employment by Vital, Horton has owned and operated Horton International, Inc. (“Horton International"), a one-person engineering and marketing consulting firm which concentrates on separation and conversion in the dairy, food, and membrane equipment industries.
Plaintiff Arthur R. Ayers (“Ayers") is a Professor of Biology and Chairman of the Department of Biology at Albertson College in Caldwell, Idaho. Between 1981 and 1986, Ayers was an Assistant Professor of Cellular and Developmental Biology at Harvard University. Ayers served as a consultant to Vital starting in early 1982 and entered into a consulting Agreement with Vital dated September 30, 1982. Ayers was issued 2,000 shares of common stock of Vital under the terms of a Stock Purchase Agreement dated September 30, 1982.
Plaintiff Estate of John R. Laughnan is the successor to the interests of the late John R. Laughnan (“Laughnan”), formerly a plaintiff in this action. Laughnan was a Professor of Plant Biology at the University of Illinois from 1974 until 1990, and an expert in plant genetics. He was a consultant to Vital starting in early 1982 and entered into a Consulting Agreement dated September 30, 1982. Laughnan was issued 2,000 shares of common stock of Vital pursuant to a Stock Purchase Agreement dated September 30, 1982.
Plaintiff George F. Murphy, Jr. (“Murphy”) is a management consultant in California and a business associate of Horton’s who consulted to Vital in 1983. He worked with Horton in the development and preparation of Vital’s first business plan and helped introduce Vital to venture capitalists. As part of his compensation for services to Vital, Murphy was issued 300 shares of common stock of Vital by consent of the Vital board dated November 29, 1984.
Tannenbaum, Wogan and Livingston are frequently asked to serve as consultants to commercial enterprises. Tannenbaum’s consulting rate in the early to mid-1980s was $ 1,500 per day. His current consulting rate is $2,500-$3,000 per day. Livingston’s consulting rate in the early 1980’s was $1,500 to $2,000 per day. His currenbconsulting rate is $5,000 per day. Wogan’s consulting rate in the early 1980’s was $1,500 to $3,000 per day, and has not changed. Benjamin and Groopman have also served as consultants, though less often than the other defendants.
2. Formation of Vital
Vital was founded in August 1981 as a research and development company by defendants Livingston and Benjamin. Subsequently, they were joined by Irving Berstein (“Berstein”) who was on the administrative staff at MIT and was looking for scientists willing to apply their scientific knowledge on matters of interest to the agricultural industry.
Vital was incorporated in February 1982 “(t]o engage in the business of research, development and manufacture of products in the fields of agriculture, veterinary science and food processing." A business description of that date states that Vital would be engaged in food protection, food processing, animal and human vaccines, and plant technology.
Benjamin and Livingston founded Vital with the hope that it could use their scientific knowledge in a way that might augment their academic incomes. Vital was and is a closely-held corporation.
Livingston, Benjamin, and Berstein recruited other scientists to join Vital. Defendant Wogan was the next scientist to join the company and, along with Berstein, Livingston and Benjamin, became one of Vital’s original directors. In 1982, plaintiff scientists Laughnan and Ayers, Arthur Karr (“Karr”)[5] and defendant Tannenbaum joined Vital as scientific consultants. Defen *702 dant Groopman joined the company one year later. Groopman, then a professor at Boston University who had previously collaborated with Wogan in development of monoclonal antibodies for aflatoxins, became a consultant to Vital in late 1983 and entered into a consulting agreement.
Defendants are internationally recognized experts in their respective fields, and brought highly specialized expertise to the development of a new aflatoxin detection test and other mycotoxin and bacterial detection tests.
At a meeting in 1982 attended by defendants, Laughnan and Karr, Karr addressed aflatoxin detection as a possible product for development by Vital.
The Articles of Organization of Vital authorized 250,000 shares of common stock at $0.01 /share par value. The board of directors is authorized under the by-laws to issue shares of common stock not to exceed the authorized shares.
As founders of Vital, Livingston and Benjamin each initially received 12,000 shares of stock. With the exception of Groopman each of the other defendants received stock when they joined Vital. Wogan received 8,000 shares. Tannenbaum received 6,000 shares. Vital issued these shares to defendants, at least in part, as compensation for services they had performed or were expected to perform for Vital.
Vital’s Articles of Organization provide that “[t]he directors will have the power to fix from time to time their compensation.” The Articles of Organization restrict transfer of the shares of Vital, effectively requiring any shareholder to tender them to Vital before selling them to a third party.
In 1982-83, Groopman and Wogan collaborated on the discovery of the monoclonal antibody for aflatoxin. This work resulted in patents for the respective universities with which they were associated, Boston University and MIT. Additionally, Groopman and Wogan collaborated on the development of an affinity column for aflatoxin. This work too, resulted in a patent for their respective universities.
Research and development of complex scientific products require substantial sums of money to lease laboratory space and equipment and to hire staff to perform experiments.
From the beginning, defendants were hoping to capitalize Vital with money received from corporations, venture capitalists or from contracts received in return for their scientific services. Defendants anticipated that Berstein, as chairman, would lead Vital’s fundraising activities.
Berstein, as part-time chairman and chief executive of the new corporation, attempted, together with the defendants then on the board, to raise funds from corporations with interests within the projected scope of Vital. He was unsuccessful, except for securing a contract with Swift & Co. which called for payment of $50,000 in return for the performance of certain services.
3. Employment of Horton
In December 1982 or January 1983, Tannenbaum, who had known Horton when Tannenbaum served as consultant to Horton’s former employer, Abcor, Inc., asked Horton if he would be interested in applying for the position of chief executive officer of Vital. Horton had operated Horton International for the prior several years. Before Horton International, Horton had worked several years for Abcor, a small company, as Vice President and General Manager of its Membrane Equipment Group.
While Horton began his employment at Vital in January 1983, his employment contract was not signed until May 1, 1983.
In February 1983, Horton consulted with Alan Lefkowitz, then a partner at the law firm of Gaston Snow & Ely Bartlett, about the terms of his potential employment contract with Vital. By this time Lefkowitz had been Horton’s attorney for approximately fifteen years.
On May 1, 1983, Horton entered into an employment contract with Vital. It provided, among other things, that Horton would work on a part-time basis until October 1, 1983, at which time the contract might be terminated by either party if Vital had not raised $1,000,000 of outside financing. Horton was to receive an annual salary of $100,000, pro-rated for part-time work, with an option to purchase 25,000 shares of Vital common stock at par value exercisable on three dates (October 1, 1983, for 8,500 shares, July 1, 1984, for 8,500 shares, and July 1, 1985, for 8,000 shares). All expenses reasonably incurred by Horton, including legal expenses incurred in connection with his employment contract, were to be reimbursed by Vital. Also, Horton was permitted to continue operating Horton International as an independent going concern unless it was acquired by Vital.
Horton’s prior positions did not include any substantial experience raising equity capital, and Horton did not misrepresent that fact to Livingston and Benjamin prior to joining Vital. On the other hand, all were aware that Vital’s success depended on obtaining capital for research and development, and that one of Horton’s principal duties as president and CEO of Vital would be to raise such capital. Horton believed that, in view of Vital’s personnel and potential products, he would be able to raise the necessary capital.
4. Vital’s History 1983-84
Sometime in 1983, after Horton began part-time work, Berstein announced his resignation as Chairman and a member of the board of Vital because of a conflict of interest. Early in 1984, Berstein agreed to surrender 21,000 of his 29,000 shares of Vital common stock, retaining 8,000 shares. He was also given preemptive rights to future issuances of common *703 stock by Vital, excluding certain future issuances of Vital stock to the defendants for “extraordinary services.”
Horton’s initial efforts for Vital focused upon preparing a new business plan to be distributed to prospective investors. For that endeavor, Horton enlisted the assistance of plaintiff Murphy, a management consultant with whom he had previously worked. Vital agreed to issue Murphy 300 shares of Vital stock and to pay him $500 per day plus expenses for his services. Horton consulted with defendants during preparation of the plan, and Ayers and Laughnan worked on sections pertaining to technical subjects. A new business plan was completed in May 1983.
The plan identified Vital’s business and product lines as food and field crop enhancement (supersweet corn, aflatoxin-ffee field corn,'mycotoxin detection); food product and process enhancement (processed meat industry and dairy industry); and livestock health protection (snake venom vaccine).
By June 1983, Horton was working nearly full time on the affairs of Vital, although he still devoted time to Horton International. Vital was under substantial pressure because of its lack of funds. In addition to his efforts at fund raising, Horton worked with and coordinated the efforts of Vital’s consultants, and handled Vital’s administrative tasks. Horton worked with Laughnan in an attempt to develop a new variety of supersweet corn through a series of plantings. The second planting was not successful and there were no funds remaining for additional plantings. Laughnan was left with unpaid fees and unreimbursed expenses of approximately $12,000, which remain unpaid today.
Horton’s search for investment capital focussed on venture capital and corporate sources, but his efforts largely failed. By October 1, 1983 Vital had not raised $1,000,000, nor did it raise $1,000,000 at any time during Horton’s employment. However, defendants did not terminate Horton in October 1983 in accordance with Paragraph 3.5 of his employment contract, nor did Horton resign in accordance with Paragraph 3.6 thereof. He continued as CEO of Vital until February 1985.
At its meeting of January 23, 1984, the board of Vital ratified Horton’s employment contract of May 1, 1983, and elected Horton as President, Treasurer and a director. The board also voted to issue 8,500 shares of common stock (at $.01 par value) to Horton and to reserve an additional 16,500 shares for issuance to Horton pursuant to Horton’s employment contract. After the conclusion of the meeting of January 23, 1984, upon issuance of the shares voted at that meeting, there were 63,800 shares of Vital common stock issued and outstanding, as follows:
Arthur R. Ayers 2,000 shares
Thomas L. Benjamin 12,000 shares
Irving A. Berstein 8,000 shares
Ray A. Goldberg 2,000 shares
Bernard S. Horton 8,500 shares
Arthur L. Karr 1,000 shares
John R. Laughnan 2,000 shares
David M. Livingston 12,000 shares
George F. Murphy, Jr. 300 shares
Stephen R. Tannenbaum 6,000 shares
Satvir S. Tevethia 2,000 shares
Gerald N. Wogan 8,000 shares
(Goldberg and Tevethia were consultants to Vital.)
In May 1984, Vital’s Business Plan was revised by Horton, with the approval of the members of Vital’s board, then consisting of Livingston, Benjamin, Tannenbaum, Wogan and Horton, to focus on three product lines only: mycotoxin detection devices (especially aflatoxin detection); supersweet com; and toxin defeat com, a product concept involving development of com seed which would resist aflatoxin. By that time, defendants’ development efforts were primarily limited to the aflatoxin detection development. By August 1984, the Business Plan had been narrowed even further, to one product line, mycotoxin detection products, with an emphasis on aflatoxin detection.
In October 1984, Horton was responsible for submission of a proposal to the United States Army for development of a rapid identification test for toxins in “Yellow Rain.” Defendants provided the technical information to be included in the proposal. Horton was to submit the completed package to a particular person at Fort Detrick in Maryland by a particular time on October 11, 1984.
Horton failed to deliver the proposal in time, and it was rejected. As a result, Vital was not considered for this $1.2 million contract.
In the summer of 1984, Horton was referred by a mutual business acquaintance to Jack Radio (“Radio”) as a businessman who might be interested in Vital’s mycotoxin detection product ideas. Radio was involved in numerous businesses in the egg and poultry industries. His initial interest in Vital was to distribute, through his partially owned corporation, Cambridge Products, Inc. (“Cambridge Products”), Vital’s aflatoxin detection product once it was developed. Horton introduced Radio to the defendants. An initial negotiation in the fall of 1984 for Cambridge Products to become Vital’s distributor was unsuccessful.
On July 24, 1984, Radio sent a letter to Horton, confirming their conversation of July 13,1984 regarding a distribution agreement between Cambridge Products and Vital, and adding that “[w]e also agreed that Cambridge Products Ltd. would invest $25,000 in this venture.” The letter concludes, “We would like to meet with your board next week to further discuss the specifics of our relationship.”
Several of the defendants and Horton met with Radio on at least two occasions in late 1984 and discussed limitations which Radio placed on the use of the $25,000. At a meeting among Horton, Living *704 ston, Wogan and Radio at the Sonesta Hotel, Radio stated that the $25,000 was to be used only for current expenses of research and development of an aflatoxin detection test, and not to pay existing obligations. Horton heard Radio’s statement and understood it.
On November 30, 1984, Horton, as President of Vital, signed a promissory note to “Cambridge Products, Ltd.” for $25,000, and received a $25,000 check.
Contrary to Radio’s explicit directions, Horton applied some $11,000 of the loan to the payment of his salary and expenses, and to fees owed to attorneys. These expenses, albeit legitimate obligations of Vital, were not related to research and development of an aflatoxin detection test.
In December 1984 or early January 1985, when Radio learned that Horton had used portions of the $25,000 loan contrary to his instructions, he was angry and demanded the return of the remainder of the loan proceeds.
At Radio’s request, the remaining $14,000 was refunded to Cambridge Products by Vital’s check signed by Horton dated January 30, 1985.
During the period between the execution of their consulting agreements and the formation of the joint venture in February 1985, defendants performed various tasks for Vital on a part-time basis. For example:
a. Before Horton joined Vital, Vital secured the above-referenced contract to do scientific consulting for the Swift Company pertaining to sausage products. Swift paid Vital $50,000 for such consulting services, which were performed only by the defendants. These funds provided the bulk of the cash available to Vital to pay its operating and other expenses during Horton’s term as president. Defendants received no cash compensation for the work they performed for Swift, either from the funds Vital received from Swift, or from Swift directly.
b. Defendants met to brainstorm about ideas which might become the focus of Vital’s scientific research.
c. Defendants assisted Horton with the preparation of Vital’s business plans and with the identification of venture capitalists to whom the plans might be distributed. They also met with and talked to venture capitalists.
d. Defendants designed and performed experiments and reviewed data in connection with Vital’s exploration of the possibility of binding a monoclonal antibody to membranes designed by Millipore Corporation.
e. Defendants discovered the U.S. Army’s interest in developing tests to detect various mycotoxins and prepared the scientific material in Vital’s proposal seeking a contract from the U.S. Army to develop a rapid detection test for aflatoxin.
f.Defendants began loaning money to Vital to enable Vital to pay some of its expenses, including a portion of Horton’s salary and expenses. By the time of trial, defendants had loaned more than $20,000 to Vital. None of the plaintiffs ever loaned any money to Vital.
Each defendant’s consulting agreement with Vital provided for compensation in the form of cash salaries and stock; however, no defendant ever received cash remuneration under the terms of these agreements.
5. Formation of the Joint Venture and Horton’s Severance
In 1984, at the same time as events surrounding the $25,000 loan occurred, Radio expressed interest in investing further in the aflatoxin detection research.
Because no other investor had been willing to invest in Vital, the only apparent chance of developing the aflatoxin detection test was through an investment by Cambridge Products.
Discussions with Radio ripened into consideration of a joint venture between Vital and Cambridge Products.
During these discussions, Radio made it clear that Cambridge Products would enter a joint venture with Vital only if Horton were not involved in the venture. Radio did not trust Horton, considered Horton to be emotional and unpredictable, and believed that Horton would bring turmoil to an already risky venture. Radio also made it clear that he had no interest in Vital’s other product ideas, and stated that the venture was to be limited to the development of an aflatoxin detection test. Defendants and Horton agreed to those terms, and to Horton’s severance from Vital.
Horton met with Livingston and the other defendants in January, 1985 concerning terms of his severance and the formation of the joint venture with Radio. Livingston proposed that the stock ownership of the individual defendants in Vital be equalized with that of Horton at 17,000 shares, so that they all would be “partners. ” It was also proposed that Horton be paid a royalty of ten cents per unit on future aflatoxin detection product sales up to a maximum of $60,000. ($60,000 was considered by Horton as roughly the equivalent of one-half of his salary accrued under his employment contract with Vital.) Horton proposed that additional shares be issued to Ayers, Karr and Laughnan for past services to Vital if the defendants were going to “dial up” their own shares. Also, initial discussions were held relating to the license of the corn-related products, that is, supersweet com and toxin defeat, to a group to be formed by Horton on terms to be negotiated.
Negotiation of the joint venture documents occurred between attorneys Richard Langerman, who represented Cambridge, Products, and Lefkowitz, who represented both Vital and Horton.
*705 All of the documents relating to the joint venture were sent to Lefkowitz. He suggested changes to various of the documents, including a proposed ‘Technical Assistance and Consulting Agreement” between Vital and the joint venture (see discussion below).
Horton received drafts of the joint venture documents and had opportunities to discuss them with Lefkowitz, his attorney. Horton received copies of the final, signed versions of the documents.
On February 4, 1985, Vital’s board of directors, including Horton, voted unanimously to form the joint venture with Cambridge Products. The joint venture was named Vicam Corporation (“Vicam” or “joint venture").
On February 7, 1985, the final joint venture documents were signed and the Vicam joint venture was incorporated. Vital and Cambridge Products each received 50% of its stock. In exchange for its 50%, Vital contributed to Vicam all of the development work done or to be done by Vital on aflatoxin detection products. The board of directors of Vicam was evenly divided between representatives of Vital and those of Cambridge Products.
The several transactions (that is, the equalization of defendants’ Vital shares with those of Horton at 17,000 shares, the joint venture with Radio, and the terms of Horton’s severance) were viewed by defendants and Horton as interrelated. Defendants wanted Horton’s acceptance of the joint venture and his acceptance of the issuance of Vital shares so as to equalize .the defendants with Horton at 17,000 shares each. At the same time, Horton was anxious to negotiate favorable severance arrangements, and recognized that Vital could not survive without the funds to be invested by Radio.
Fifteen months later, on May 13, 1986, at the annual meeting of stockholders, Vital’s stockholders approved and ratified the joint venture.
A Research and Development Agreement was entered into between the joint venture and Cambridge Products whereby the joint venture agreed to complete development of the aflatoxin detection product and Cambridge Products agreed to fund such development in an amount up to $100,000. Cambridge Products agreed to reimburse the joint venture for all research and development services purchased by the joint venture. Concurrently, the Technical Assistance and Consulting Agreement was entered into between the joint venture and Vital, and a Management Services and Occupancy Agreement was entered into between the joint venture and Cambridge Products.
The joint venture also entered into a letter agreement with Horton. It agreed to pay him a royalty of 10 cents per unit of aflatoxin detection products sold, up to a total of $60,000, in royalty payments, and to pay him a two-month consulting fee of $4,000 for transitional services in connection with the joint venture.
Both the $60,000 royalty and the $4,000 in consulting fees were paid in full. Unlike Berstein, Horton retained all 17,000 shares of his Vital stock.
When Vital entered into the joint venture, Vital owed money to numerous creditors.
Before the joint venture, Vital never had its own laboratory or office space.
6. February 4, 1985 Issuance of Vital Stock
At the February 1985 board meeting, the Vital directors, including Horton, also unanimously voted to offer additional shares of stock to nine of Vital’s then existing stockholders, and to offer 17,000 shares to Groopman, who had not previously owned Vital stock. The other four defendants were offered sufficient shares to equalize their holdings at 17,000 shares each.
The shares were issued to defendants to compensate them for services rendered during the previous year; to equalize their holdings to reflect the fact that they were all of equal importance to Vital; and to provide them with an incentive to continue their work on the aflatoxin detection product.
The defendants and Horton considered themselves “partners” in Vital following the vote, each with 17,000 shares in an entity which would become a passive stockholder in the new joint venture.
The board also voted to offer Laughnan and Ayers 2,000 shares each, and to make offers to Berstein, Karr and Fried. None of the other passive stockholders in Vital were awarded any shares. Horton had earlier proposed, in January 1985, that Ayers, Laughnan and Karr should be “dialed up,” i.e. their numbers of shares should be increased, because they had performed work for Vital and had not been paid. Horton’s solution for compensating them for uncompensated contributions to Vital was to issue them additional stock, and that is what he and the other Vital directors voted on February 4, 1985.
The stockholders of Vital and the number of shares held by each stockholder following the board vote on February 4, 1985, were as follows:
Arthur R. Ayers 4,000 shares
Thomas L. Benjamin 17,000 shares
Irving A. Berstein 11,300 shares
Jules M. Fried 3,000 shares
Ray A. Goldberg 2,000 shares
John D. Groopman 17,000 shares
Bernard S. Horton 17,000 shares
Dennis E. Jackson 500 shares
Arthur L. Karr 4,000 shares
John R. Laughnan 4,000 shares
David M. Livingston 17,000 shares
George F. Murphy, Jr. 300 shares
Jack L. Radio 500 shares
Stephen R. Tannenbaum 17,000 shares
Satvir S. Tevethia 2,000 shares
Gerald N. Wogan 17.000 shares
Total 133,600 shares
*706 (Dennis E. Jackson, a business associate of Radio (“Jackson”), and Radio were voted 500 shares of Vital each by Vital’s board on November 29, 1984.)
The board also voted unanimously to terminate all of Vital’s consulting and employment agreements and to replace them with agreements “more appropriate to [Vital’s] present structure.” Vital executed no subsequent consulting and employment agreement with any individual.
7. Corn Product Spin-off
As noted above, the defendants and Horton had preliminary discussions prior to the joint venture concerning the spin-off of the corn-related product ideas of Vital (supersweet corn and toxin defeat), to a group to be formed by Horton (Ayers, Benjamin, Karr and Laughnan). The negotiations contemplated that, in return for the spin-off, Horton would give up any remaining claims under his employment contract, including a claim to 8,000 shares of Vital stock due to Horton under the contract by July 1, 1985. Radio had no interest in the corn-related ideas, the defendants (other than Benjamin) had little interest or expertise, and Vital did not have the resources to pursue these developments. Horton expected Ayers to coordinate the technical developments if the spin-off took place.
Horton and Livingston reached an agreement in principle which was set forth in two letters from Horton to Livingston dated April 23, 1985. Under the agreement a new company to be formed by the Horton group would have a two-year exclusive license of Vital’s supersweet corn and toxin defeat product lines, and would pay royalties to Vital on a stated schedule. In return, Horton agreed to give up his right to 8,000 shares of Vital common stock which was to vest in July 1985, and any accrued salary and any other claim under his employment contract.
On April 30, 1985, Vital’s board of directors (the defendants plus Horton) agreed “in principle” to conditions of severance of Horton’s employment, expressly including the arrangements for the spin-off of the corn-related products set forth in the letters from Horton to Livingston of April 23, 1985. According to the minutes, final approval of Horton’s severance “will be taken on legal documents describing those terms, to be prepared by Jules Fried,” counsel to Vital.
Horton thereafter proceeded on the assumption that the spin-off arrangements were agreed upon by Vital. (Fried’s failure timely to prepare the “legal documents,” and Horton’s failure to inquire about their progress, are unexplained.) Horton prepared a business plan with the assistance of Ayers, and called on a number of corporate prospects for financing development of the product ideas, including United Agriseed. On December 18, 1985, Horton resigned from the board of directors of Vital in anticipation of a potential conflict between the spin-off and his position on Vital’s board.
In late December 1985, following his resignation from Vital’s board, Horton received a telephone call from Fried to the effect that Vital’s board had not agreed to the terms in Horton’s April 23, 1985 letters, and was unwilling to go forward with the spin-off of the corn-related product ideas on that basis. Fried proposed that Horton and the other members of his group, other than Benjamin, give up their holdings of stock in Vital as a condition of the spin-off. Horton and the non-defendant members of the group, Ayers, Karr and Laughnan, rejected the proposal to give up their Vital stock; Horton communicated their rejection at a dinner meeting with Fried, Livingston, Tannenbaum, Benjamin, Wogan and Groopman at the end of January 1986.
The board of directors of Vital, at a meeting held January 27, 1986, voted to license the corn-related products to a corporation to be formed by Horton’s group only if the members of Horton’s group gave up their Vital stock or, in the alternative, made available an unspecified amount of stock in the new corporation to be formed by Horton’s group.
As a result of defendants’ new position, there was an impasse. In September 1986, Vital, through Fried, withdrew its requirement that Horton’s group give up their Vital stock. Although Horton continued throughout this period to work on spin-off products, particularly with United Agriseed, neither side pressed for a resolution with much urgency. Finally, on July 22, 1987, a license agreement was reached with Vital on a royalty only basis (similar to the arrangement agreed to in principle on April 30, 1985), plus a new provision for reimbursement of Vital expenses for research and development in 1983-1984. The effect of defendants’. reversal on the agreement in principal, and the resulting delay, was an irritant to Horton, but did not materially contribute to the failure of the spin-off.
8. Defendants’ Consulting Services for the Joint Venture
The Vicam joint venture solved, for the moment, the Vital stockholder’s problem of insufficient capital; it addressed, but did not solve, their problem of insufficient compensation. The Radio group, which through Cambridge Products controlled fifty percent of Vicam, invested at least $100,000 in Vicam. Those funds were marked for research and development; in Radio’s view, there was no money to spare for compensation to the defendants, except for Groopman. Groopman, with assent of all parties, received a consulting agreement from Vicam, pursuant to which he set up and supervised a laboratory at Boston University for Vicam’s mycotoxin detection research. Vicam funded the lab, including Groopman’s $12,000 annual compensation and a full-time technician, with money invested by Cambridge Products.
The parties addressed the issue of compensation to the remaining defendants in the documents creating and approving the joint venture, as follows;
*707 a. As noted above, on February 4, 1985 the Vital directors voted that “all agreements” between Vital and individuals “regarding consulting and employment be terminated and that these contracts be replaced with agreements more appropriate to the present structure of this corporation, the latter action to be taken” at a subsequent special meeting of Vital’s board.
b. The February 7, 1985 “Joint Company and Stock Tranfer (sic) Restriction Agreement” (“joint venture agreement”) states at §I.A. that Vital’s “stockholders, officers and employees possess technological skills useful in the further development of mycotoxin detection products,” and at §I.E. that “Technical assistance and other consulting services are to be provided to Vicam pursuant to a Technical Services and Consulting Agreement . . . between Vicam and [Vital] ...”
c. The February 7, 1985 “Technical Assistance and Consulting Agreement” (‘Technical Assistance Agreement”) provides, at §2, that Vicam “engages [Vital] to provide Vicam with such technical assistance and consulting services as Vicam may reasonably require and request from time to time” in connection with research, development, manufacture and sale of mycotoxin detection products. Vital agreed “to cause those of its officers, employees and stockholders from time to time qualified for the purpose” to provide such services to Vicam. At §3, “Compensation,” the agreement provides:
Vicam shall directly pay for or shall reimburse [Vital] for all out-of-pocket expenses incurred by [Vital] ... in connection with providing technical assistance and consulting services to Vicam hereunder. Out-of-pocket expenses incurred by [Vital] for purposes of the foregoing shall not include salaries or other compensation paid or payable by [Vital] to its officers, employees, stockholders or others providing such technical assistance and consulting services to Vicam, except as and to the extent expressly provided hereafter in an agreement between Vicam and any such person . . .
Vicam and [Vital] shall quarterly review the technical assistance and consulting services furnished to Vicam hereunder . . ., and [Vital] shall be entitled to such compensation therefor as Vicam and [Vital] shall agree upon with a view to the nature and extent of the . .. services provided and their contribution to the success and profitability of Vicam.
As of February 7, 1985, then, all parties understood and agreed that under the Technical Assistance Agreement Vital was obligated to “caíase ... its officers, employees and stockholders to provide technical assistance and consulting services to Vicam,” and that Vicam had no obligation to pay any such person individually for such services.
For the balance of 1985, defendants met on a weekly basis and in varying degrees provided research expertise to Vicam, devoted primarily to development of the mycotoxin detection technology called “ELISA” (enzyme-linked immunosorbent assay). ELISA was designed to quantify the amount of aflatoxin present on the grain or other food sample being tested.[6] The Radio side had no incentive or desire to compensate defendants (other than Groopman), especially when the product on which they were working was so problematic. ELISA was too cumbersome, time-consuming and complicated for use in the field by its likely users. By the beginning of 1986 it was apparent to Radio that the ELISA product was going nowhere, and he was ready to scrap it.
As plaintiffs assert, during 1985 the defendants, to the extent that they considered the matter, thought that they were providing services directly to Vicam; indeed, the Court finds that they were actually providing services directly to Vicam. Defendants were scientists, not lawyers, and their notion as to what party they were working for conformed to the simple reality that the operating entity was now Vicam, not Vital. That finding is not inconsistent with the agreement by all parties, including plaintiff, in February 1985 that Vital would cause its officers and stockholders who had necessary expertise to provide that expertise to Vicam. In view of that agreement it is not the case, as plaintiff asserts, that services rendered to Vicam were to be compensated, if at all, by Vicam. Vicam was expressly excused by the parties from any commitment to compensate the defendants, even though Vicam was the entity receiving the benefits of their services. The Court finds that defendants provided services to Vicam in 1985, and into 1986, pursuant to Vital’s contractual obligation to cause them to provide such services. The Court also finds that during that period there was no agreement between defendants and Vital as to any compensation which defendants would receive from Vital for such services.
9. The January 1986 Product Breakthrough
At a meeting in early January 1986 with defendants, Radio and Jackson told defendants bluntly that ELISA did not work in the field and should be abandoned. Radio and Jackson informed defendants that unless they developed a test that was practical for use in the field, the joint venture was dead because Cambridge Products would not provide more money to support the current research. They told the defendants that to be successful, a test was required which would permit quantification of aflatoxin within three to four minutes, was simple to use, and was sufficiently rugged to withstand the rigors of field conditions.
Later in the afternoon of the same January 1986 meeting, Groopman had a stunning insight which, according to Livingston, was a form of salvation of the joint venture. Groopman proposed that fluorescent light could be used to measure the quantity of aflatoxin because of the presence of fluorescent properties within aflatoxin. The proposed test was a revolution *708 aiy development, presenting the possibility of an aflatoxin detection product which was simpler and more rugged than the ELISA technique.
It quickly became clear that the new approach was revolutionary, was technologically feasible, and could be performed under laboratory conditions. It was also clear that significant work was required to develop a marketable test that would measure aflatoxin in peanuts, corn and other feed products under field conditions.
Radio was eager to have the fluorescence breakthrough demonstrated at the Southeastern Poultry Show, a key annual trade show to be held in Atlanta during the third week of January 1986. Groopman conducted experiments, prior to the trade show, to test his new theory. He also obtained an inexpensive and portable machine to detect fluorescence. On January 11, 1986, before the trade show, Groopman reported to Wogan that his experiments proved that the technology worked. At the trade show, an early-stage prototype was demonstrated and a videotape of experiments and procedures was shown.
The reception to the new fluorescence technology at the poultry trade show was enthusiastic; the trade recognized that the fluorescence technology was a fundamental breakthrough in aflatoxin detection. What remained was for Vicam to develop the prototype demonstrated in Atlarita into a marketable product.
By August 1986, Vicam had introduced the first aflatoxin detection product to the commercial market. By the end of 1986, Vicam’s “Aflatest” had satisfied standard field tests and was approaching commercial viability.
10. The January 27, 1986 Issuance of Vital Stock to Defendants
As noted above, other than the laboratory supervision fees received by Groopman, Vicam was unable to pay defendants for their scientific work in 1985.
Article VIII of Vital’s By-Laws provides that:
The Board of Directors shall have authority, without first offering the same or any part of the same to any present or future stockholders for subscription, to issue the whole or any part of any unissued capital stock from time to time authorized under the Articles of Organization of this corporation to such persons, firms, corporations or other organizations, in such manner and amounts and for such consideration or considerations and upon such terms and conditions as the directors may in their discretion from time to time determine. No stockholders shall have any pre-emptive rights to acquire stock of the corporation.
Under Vital’s By-Laws and Articles of Organization, directors are not required to give shareholders notice of meetings of the board of directors.
While he was president and a director, Horton became familiar with the Articles of Organization and the By-Laws of Vital.
Vital had no cash to pay defendants for the scientific consulting services they provided to the joint venture during 1985.
At a January 27, 1986 Vital board meeting, Livingston, Tannenbaum, Benjamin and Wogan, as four of Vital’s five board members (Groopman was absent), voted to issue 22,225 shares ofVital’s outstanding and authorized stock to each defendant. Specifically, the four directors voted to allow each defendant, “for providing extraordinary services to the Corporation for the calendar year 1985,” to purchase 22,225 shares at par value of $.01 per share, “the Board having determined that such services have a value equal to or greater than the market value of the shares being issued.”
The stock was issued to compensate defendants for services they provided to Vicam in 1985, and to provide them with an incentive to keep working to develop the new concept into a marketable product. The vote to issue and offer stock to defendants was consistent with the February 4, 1985 directors’ vote (in which Horton participated) that all consulting and employment agreements between Vital and individuals be terminated and replaced with agreements "more appropriate to the present structure of this corporation, the latter action to be taken” at a subsequent special meeting ofVital’s board.
As of February 4, 1985, with the joint venture about to be formed, Vital was and would remain a passive corporation, generating no revenues. Accordingly, in February 1985 it should have been apparent to all directors (including Horton) that, until it began receiving a return on its stock in Vicam, the only way in which Vital could compensate those whom it caused to consult for Vicam under the Technical Assistance Agreement was to issue stock of Vital.
Defendants’ services to Vicam in 1985 conferred a substantial benefit on Vital and its shareholders.
At the January 27, 1986 board meeting, the board also voted to issue 3,925 shares to Vital’s legal counsel, Fried. The Vital shareholders and the number of shares issued and outstanding or voted to be issued following the January 27, follows: 1986, meeting were as
Arthur R. Ayers 4,000 shares
Thomas L. Benjamin 39,225 shares
Irving A. Berstein 11,300 shares
Jules M. Fried 6,925 shares
Ray A. Goldberg 2,000 shares
John D. Groopman 39,225 shares
Bernard S. Horton 17,000 shares
Dennis E. Jackson 500 shares
Arthur L. Karr 4,000 shares
John R. Laughnan 4,000 shares
David M. Livingston 39,225 shares
George F. Murphy, Jr. 300 shares
*709 Jack L. Radio 500 shares
Stephen R. Tannenbaum 39,225 shares
Satvir S. Tevethia 2,000 shares
Gerald N. Wogan 39.225 shares
Total 248,650 shares[7]
As a result of the vote, there were 248,650 shares of common stock of Vital issued and outstanding out of the 250,000 shares authorized under the Articles of Organization. Defendants’ share of Vital’s stockholding increased from 63.7% before the January 27, 1986 vote to 78.9% after the vote. (If Fried’s shares are included with those of defendants, the percentage increases to 81.7%) Conversely, the stockholdings of plaintiffs decreased from 18.9% before the vote to 10.2% following the vote.
The number of shares voted by the defendant directors was determined in reference to the number of shares authorized; no shares beyond the amount authorized could be voted by the board of directors without a meeting of stockholders to approve an increase in the authorized capital by amendment of the Articles of Organization. Defendants, with the advice of Fried, purposely kept the number of shares voted below the number of authorized shares so as to avoid the necessity of calling a stockholder’s meeting to authorize a greater number.
At the time of the January 27, 1986 stock issuance, the value of the joint venture was indeterminate, but likely did not exceed $300,000; each block of 22,225 shares of Vital stock was therefore worth not more than $13,335. This finding is based on the following;
a. Cambridge Products invested $100,000 in the joint venture in February, 1985, the first substantial investment in the Vital technology since Vital’s formation in 1981;
b. Cambridge Products received 50% of the joint venture for its $100,000 investment;
c. while the skills of the Radio group and the defendants contributed value to the joint venture, that value did not exceed the value of Cambridge Products’ investment;
d. while defendants’ revolutionary conceptual breakthrough added value, a considerable amount of work needed to be done before that conceptual breakthrough was convertible into a marketable product; moreover, a significant portion of the initial $100,000 investment had already been spent, and essentially lost, on the ill-fated ELISA technology;
e. Vital’s 50% share of the joint venture’s value as of January 27, 1986 was worth not more than $150,000; and
f. dividing $150,000 by the number ofVital’s issued and outstanding shares, 248,650, results in a per share value of $0.60.
Based on the foregoing, the 22,225 shares of stock issued to each defendant (worth $13,335, if calculated at $.60 per share) did not amount to unreasonable compensation. The following facts support this finding:
a. This sum is less than the compensation specified in the consulting contracts which defendants executed in 1982;
b. The sum is considerably less than the amount any defendant would have received, at his usual daily consulting rate, for weekly consulting services from February 1985 through January 1986;
c. Defendants’ work was indispensable to the continued existence of Vital and Vicam; and
d. Each defendant passed up other consulting opportunities to continue working for Vital and Vicam despite the failure of each corporation to provide them with any spendable compensation.
At a May 13, 1986 annual meeting of Vital’s stockholders, the total holdings of each defendant (39,225 shares, including the 22,225 shares issued to each on January 27, 1986) were reported on a certified list.
Although notice of that meeting was sent to every stockholder of record, none of the plaintiffs attended the May 13, 1986 Vital stockholders meeting.
The minutes of that meeting state that each defendant held 39,225 shares of Vital stock.
Horton attended the November 2, 1987 Vital stockholders meeting. The minute books evidencing the January 27, 1986 stock issuance, as well as the minutes of the May 13, 1986 stockholders’ meeting, were open for inspection at the meeting.
At the November 2, 1987 stockholders’ meeting the total number of shares represented by stockholders at the meeting (220,050) was announced. That number is considerably higher than the 133,600 shares outstanding between February 4, 1985 and January 27, 1986, and is close to the 250,000 shares authorized.
The announcement of the number of shares represented at the November 1987 shareholders’ meeting in Horton’s presence was sufficient to put him on inquiry notice that additional stock had been issued since February 4, 1985.
While Horton was on inquiry notice of the January 27, 1986 issuance of stock to defendants as of November 2, 1987, he did not have actual knowledge thereof prior to October 15, 1989.
No other plaintiff received actual notice of the January 27, 1986 stock issuance prior to October 15, 1989. No defendant disclosed the stock issuance to any plaintiff prior to October 15, 1989.
11. The May 7, 1986 Cancellation of Vital Stock Voted to Ayers, Karr and Laughnan February 4, 1985
Shortly after the February 4, 1985 board vote to offer shares of Vital to Ayers (2,000 shares), Karr (3,000 shares) and Laughnan (2,000 shares), Horton *710 informed each of those individuals about the board’s actions at the meeting, including the vote to offer them additional stock. Each understood that, pursuant to the vote, he could purchase the number of shares offered for $.01 per share par value.
At Vital’s March 17, 1986 board meeting (Livingston, Groopman, Wogan, and Tannenbaum attending), Vital’s counsel, Fried, reported that he had sent letters to Ayers, Karr and Laughnan, conveying the board’s February 4, 1985 offer to purchase shares and requesting payment, and that none of the three had tendered payment. The board concluded that the three were not interested in owning more shares of Vital, and voted to withdraw the offers.
On December 6, 1986, Ayers executed a Vital shareholders’ “Consent to Election to be Treated as an S-Corporation,” which document stated thathe owned 2,000 shares of Vital, the number he owned prior to the February 4, 1985 board meeting.
In or about 1988, Ayers received from Vital and reviewed a schedule K-l, “Shareholder’s Share of Income, Credits, Deductions, etc.,” stating that he owned 2,000 shares of Vital at December 31, 1987.
Neither Ayers, Karr, nor Laughnan offered payment for shares voted at the February 4, 1985 board meeting prior to commencement of this action.
12. Defendants’ 5% Consulting Agreements with Vicam
On April 14, 1986, Richard Langerman, attorney for Vicam, described in a memorandum the basis on which Vicam and defendants would continue their association:
Commercial development of the aflatoxin detection product has apparently progressed to the point where it is at or near completion for sale to users thereof. [As noted below, the Aflatest product did not reach the general market until 1987.] In addition to the technical assistance and other consulting services which, pursuant to the Technical Assistance and Consulting agreement, Vicam has obtained from Vital Technologies in the completion of the development of such aflatoxin detection product, Vicam has obtained from five individuals [defendants herein] advice and other services relevant to the applications and uses of the aflatoxin detection product, as to potential enhancements and improvements of that product and as to other mycotoxic detection products which Vicam might design, develop, manufacture and sell in the future. Vicam desires to provide reasonable compensation for such advice which it has received from such individuals to date, to secure for itself similar advice in the future and to obtain assurances from such individuals that they will not provide such advice in the future to Vicam’s competitors or potential competitors. Accordingly, it has been proposed that Vicam enter into an agreement with each of such individuals which would provide for the foregoing, including compensation payable to each such individual in an amount equal to 5% of Vicam’s annual pre-tax profit in excess of portions thereof periodically determined by Vicam’s Board of Directors to be retained for research and development, capital expenditures, working capital and the like.
Between July and September 1986, Vicam and each defendant executed what became known as the “5% Consulting Agreements.” Langerman’s description accurately reflects Vicam’s and defendants’ motivations for entering those agreements.
Each agreement required defendants to provide advice to Vicam to improve its scientific marketing. Each agreement was for a term of one year, but contained a provision that it “may be renewed in writing for such further period as may be agreed on by the parties.” Defendants were each “to be paid a fee equal to 5% of the Company’s Undesignated Revenues[8] for or during such fiscal year.” The 5% Consulting Agreements also contained non-compete provisions.
Similar consulting agreements were entered into with Radio and other key consultants associated with Cambridge Products, who agreed to provide marketing and management services to Vicam.
When defendants and the Radio group entered into the consulting agreements with Vicam, they knew that it was highly improbable that there would be any undesignated revenues for the foreseeable future.
After December 31, 1986, each defendant’s 5% consulting contract was renewed orally, or impliedly by the conduct of the parties thereto, for an indeterminate period, terminable at the will of either party thereto.
Vicam did not have any undesignated revenues in 1986 or 1987 and, therefore, neither the defendants nor the Radio group received any compensation under the 5% Consulting Agreements.
The 5% Consulting Agreements, when executed, served a reasonable and appropriate business purpose in view of the early stage of product development, and of defendants’ work on product development for the joint venture without cash compensation.
From the conceptual breakthrough in January, 1986 until November, 1987, defendants contributed significant services, both quantitatively and qualitatively, to the joint venture. They succeeded in developing the new aflatoxin detection concept into a commercially viable product, and went on the road to market the product at trade shows in the United States, Mexico, and the United Kingdom.
Official sales of the product to the general market began in mid-1987.
Defendants never received any cash remuneraction from the joint venture between January 28, 1986 and *711 November, 1987 for either their scientific work or their scientific marketing.
13. The November 1987 Reorganization of Vicam as a Limited Partnership
Once the Vicam joint venture was formed in February 1985, Horton’s contacts with the business substantially diminished. Several times he inquired of Livingston, Radio or others concerning the status of the business, and of the likely commencement of commission payments to him pursuant to his termination agreement with Vital. On July 29, 1987, Radio informed Horton that Vicam was forming a partnership to obtain capital investment to do further product development.
Earlier that year, Vicam had asked its attorney, Langerman, for advice in connection with Vicam’s desire to raise up to $3,000,000 in capital from outside investors for research and development. By memorandum of June 18, 1987, Langerman recommended to Vicam’s stockholders (Vital and Cambridge Products) that Vicam be reorganized as a limited partnership. Langerman based his recommendation primarily on 1986 changes to the federal tax laws whereby income from the business would be taxed more favorably at individual rates than at corporate rates.
Langerman also advised that for Vicam to raise outside investor funds, the defendants would have to give up their claims on revenues from the 5% Consulting Agreements, and that the Radio group would have to forego their similar consulting agreements. The defendants understood that their prior claims to “undesignated revenues” would be unacceptable to new investors.
Throughout their negotiations concerning the limited partnership, defendants and the Radio group contemplated that Vital would end up with a 25% share of the reorganized business, as opposed to the 50% share it held in the joint venture, and that defendants as a group would end up with the remaining 25% share. Their rationale was that, because the defendants were the individuals whose scientific expertise was essential to the success of the limited partnership, they should receive equity shares of the reorganized business which would compensate them for the loss of 5% of undesignated revenues under the 5% Consulting Agreement each defendant was foregoing. As additional consideration for the 5% equity which each defendant was to receive in the limited partnership, each defendant agreed to sign a new consulting agreement with the reorganized business, providing for fixed compensation rather than a share of undesignated revenues.
I find that, as between defendants and the limited partnership, there was sufficient consideration to support the issuance of 5% equity in the latter to each defendant, and that such issuance was reasonable and appropriate so far as the limited partnership was concerned.
On November 2, 1987, there was as noted above a special meeting in lieu of annual meeting of stockholders of Vital. It was brief, lasting not more than ten minutes. Present were defendants, Fried, and Horton. The shareholders adopted a resolution approving and ratifying acts of the officers and board of directors, and elected defendants as directors for one year terms. “No other business coming before the meeting,” it was adjourned.
No mention was made at the November 2,1987Vital stockholders meeting of the impending reorganization of Vicam, or of the planned reduction of Vital’s equity in the joint venture, which was Vital’s primaiy asset. As of November 2 defendants had agreed with the Radio group on the legal structure for effecting the reorganization, including the provisions that would reduce Vital’s share of the reorganized business from 50% to 25%.
The limited partnership was created on November 16, 1987, through a complex series of corporate transactions set forth in detail in a “Closing Memorandum” (Trial Ex. 33). The following principal steps were taken:
a. Vicam was reorganized into a limited partnership called Vicam, Limited Partnership (the “limited partnership” or “VLP”).
b. Vicam Management Corporation (“Vicam Management”) was formed to serve as the managing general partner of the limited partnership. It received a 62.5% interest in VLP. Defendants were given 40% of Vicam Management’s stock, which meant that they thereby owned a 25% (40% x 62.5%) interest in VLP. The Radio group received 60% of Vicam Management’s stock, giving it a 37.5% interest in VLP.
c. The remaining 37.5% interest in VLP (i.e., other than the 62.5% interest held by Vicam Management), was allocated to Vital as a “Special General Partner” (25%) and to a Cambridge Products affiliate, Naremco, Inc., as a Class A Limited Partner (12.5%).
d. Class B and C limited partnership units were established, intended for private placement with outside investors (in units of $50,000) in an amount up to $3,500,000.
Neither defendants nor Fried (counsel for Vital) advised any plaintiff of the structure of the limited partnership, and specifically of the reduction ofVital’s share of the business by one-half, for years after November 1987. The first minority shareholder who learned of the reduction of Vital’s share was Berstein, who in December 1988 asked Livingston directly what Vital’s ownership was in the limited partnership. Livingston replied that it was in the range of 22-25%. Horton did not discover the reduction in Vital’s share until 1991.
*712 Defendants did not affirmatively set out to deprive plaintiffs of their share in the business by halving Vital’s share thereof through the formation of the limited partnership, and allocating the former Vital share to themselves. Rather, defendants and Vital’s counsel, Fried, were focused on preserving reasonable compensation for themselves in a venture to which they had all loaned money, invested substantial time, energy and expertise, and in which they were expected to invest much more in the future. They seem not to have considered the minority shareholders in the discussions leading up to the November 1987 reorganization, beyond recognizing that they should not simply liquidate Vital, thereby extinguishing the minority interests, and, like Tannenbaum, thinking that the expected infusion of capital would increase the value of everyone's equity.
Running through defendants’ testimony is the sense that they were the active, contributing scientists in the venture that had begun at Vital but had outgrown it, and that plaintiffs, albeit “partners,” were now “passive stockholders.” Plaintiffs, in defendants’ view, had no right of participation in the operations of the joint venture or limited partnership, and were not to be given information about those operations beyond that which Vital’s attorney said they should be given.
Fried apparently never told defendants that they owed a duty to plaintiffs to advise them that Vital’s stake in its primary asset, and therefore plaintiffs’ stake, was about to be reduced by half, or to structure the limited partnership reorganization so as to preserve the plaintiffs’ proportionate share of the enterprise.
Livingston, of all the defendants, was perhaps most involved in the restructuring of the joint venture, and in discussions with Fried. His idea for the limited partnership was that it would not only take over the ideas and products begun at Vital and continued at Vicam, but would also receive and develop other ideas which defendants would bring to it. It was he who felt that it would be wrong to liquidate Vital, because he considered the minority shareholders to be partners “in a sense,” and because litigation would likely ensue. Livingston testified, and the Court finds, that the defendants acted as a group on matters relating to distribution of stock and structuring of the limited partnership, and that no one disagreed with the structure that was adopted. Livingston agreed that the allocation of 25% of the new limited partnership to defendants necessitated a reduction in Vital’s interest from 50% to 25%.
In view of the Court’s rulings below, it is unnecessary to make further findings regarding either the tortuous course of Horton’s correspondence with defendants and their counsel seeking further information on the formation and operation of the limited partnership, or the valuation of the limited partnership.
RULINGS OF LAW
A. Summary of Claims, Defenses, and Rulings
Plaintiffs claim that defendants, as the controlling shareholders of Vital, breached their fiduciary duty to plaintiffs by acting to freeze out Vital’s minority shareholders, including plaintiffs. Plaintiffs focus on two transactions which they allege diluted the minority shareholders’ equity in Vital: defendants’ issuance to themselves of 22,225 shares each of Vital stock pursuant to their January 27, 1986 vote, as Vital’s directors: and the reorganization of Vicam Corporation (the joint venture) into Vicam Limited Partnership, which resulted in a reduction of Vital’s interest from 50% of Vicam Corporation to 25% of Vicam Limited Partnership.
Plaintiffs assert that defendants’ participation in the disputed transactions constitutes a breach of their fiduciary duty in that (1) defendants intended to aggrandize themselves, and to harm the minority shareholders of Vital, contrary to their duty of “utmost good faith and loyalty” to the latter; (2) the disputed transactions involved self-dealing by defendants, violating their duty to act in good faith and entire fairness in the totality of the circumstances; and (3) defendants not only failed properly to disclose their actions to plaintiffs, but actively concealed them. In support of their claims, plaintiffs point to defendants’ conduct with regard to several collateral matters, which together with the disputed transactions comprise an alleged “course of action to ‘freeze-out’ the minority stockholders of Vital. . .” Plaintiffs’ Proposed Rulings of Law, at 90.
Defendants deny that they breached their fiduciary duty to plaintiffs, and assert (1) that plaintiffs’ claims must be brought, if at all, in a derivative action, not the present direct action; (2) that Horton’s direct claims based on the January 27, 1986 stock issuance are barred by the statute of limitations; (3) that the challenged transactions were reasonable and fair; (4) that defendants acted with a legitimate business purpose, i.e., to compensate themselves for services rendered in developing the aflatoxin detection product; (5) that plaintiffs failed to show that the same objective could have been achieved through means less harmful to plaintiffs; and (6) that defendants’ actions were consistent with plaintiffs’ reasonable expectations as shareholders of Vital. Defendants’ Proposed Rulings of Law, at 41-42.
As set forth below, the Court concludes that the action is properly brought as a direct action; that Horton’s claim of breach of fiduciary duty based upon the January 27, 1986 stock issuance is not barred by the statute of limitations; that the January 27, 1986 stock issuance did not constitute a breach of fiduciary duty by defendants; that defendants did breach their fiduciary duty to plaintiffs by approving the November 1987 reorganization of the joint venture into a limited partnership, thereby halving plaintiffs interest in the *713 business which Vital had transferred to the joint venture; and that equity requires a transfer by defendants to plaintiffs of that number of shares of Vital which will restore to the plaintiffs the percentage of the joint venture which they owned indirectly prior to the November 1987 reorganization.
B. The Action is Properly Brought as a Direct Claim
The gravamen of plaintiffs’ claimed breach of fiduciary duty is that defendants, who at all relevant times held a majority interest in Vital, twice acted so as to dilute plaintiffs’ minority share in Vital. Plaintiffs assert that the freeze-out consisted not in defendants’ taking excessive compensation or otherwise converting assets, but rather in the simple and wrongful reduction of plaintiffs proportionate stake in Vital, or in Vital’s principal asset.
If proved, such a dilution would constitute one form of a “freeze-out” of the minority by the majority, and would give the minority a cause of action. Cf. Donahue v. Rodd Electrotype Co. of New England, 367 Mass. 578, 600 n.25. Donahue held that, where controlling stockholders deny the minority equal opportunity in stock purchases, the minority is entitled to appropriate relief on direct claims. The court went on to state, in dicta, that “to the extent that a controlling stockholder or other stockholder, in violation of his fiduciary duly, causes the corporation to issue stock in order to expand his holdings or to dilute holdings of other stockholders, the other stockholders will have a right to relief in court.”
Later cases have defined some limits to the scope of Donahue. In Crowley v. Communications for Hospitals, 30 Mass.App.Ct. 751, 765 (1991), the court observed that
where corporate recovery for misdeeds by a corporate fiduciary is available under traditional corporate law, and such recovery provides a just measure of relief to the complaining stockholder, resort to a direct, personal action against miscreant fiduciaries may not be available even when the acts complained of may be seen as a freeze-out scheme. A finding of a ‘freeze-out’ scheme may well be an element of a case for direct relief, but it is not necessarily sufficient to preclude the need for derivative relief.
Crowley distinguishes between cases in which indirect relief through derivative claims cannot succeed, as in Donahue, and those in which derivative claims “had every good reason to succeed,” as in Bessette v. Bessette, 385 Mass. 806 (1982). In Bessette, the court held that “a direct, personal action by a minority stockholder against the majority stockholder for excessive salary payments, and payments on notes which failed for lack of consideration, must be dismissed because ‘the right to recover the overpayments belongs to the corporation.’ ” Crowley, 30 Mass.App.Ct. at 764, quoting Bessette at 809. The court in Crowley concluded that Crowley’s claim (“unlawful diversions of corporate earnings”) was like that in Bessette, and remanded the case for entry of an order under derivative rather than direct claims.
The court acknowledged, however, that “(t)he rule of corporate recovery for wrongs to the corporation may not be inflexible,” Crowley, 30 Mass.App.Ct. at 765 n.17, citing Samia v. Central Oil Co., 339 Mass. 101, 123 (1959), where “direct relief to the complaining shareholder was permitted in order ‘more justly [to] apportion the burden of the recovery among the wrongdoers.’ ”
I conclude that the allegations in this case based upon the January 1986 issuance of stock to defendants state a direct claim of wrongful dilution of plaintiffs’ stock, and that the allegations based upon the November 1987 reorganization, resulting in the reallocation to defendants of one-half of Vital’s corporate stake in Vicam, state both a direct claim for further wrongful dilution, and a derivative claim for misappropriation of a corporate asset. I further conclude that in the circumstances of this case “corporate recovery . . . under traditional corporate law” would not provide “a just measure of relief to the complaining stockholder[s],” Crowley, 30 Mass.App.Ct. at 765, and that direct action is appropriate. As more fully set forth below, defendants’ principal misdeed — reduction of Vital’s share from 50% of the joint venture to 25% of the limited partnership — cannot, in the circumstances, be reversed so as to restore to Vital that portion of its stake which defendants misappropriated. Rather, the appropriate equitable relief is to achieve the same end by increasing plaintiffs’ percentage holdings of Vital so that their indirect share in the limited partnership is equal to their indirect share of the joint venture prior to the November 1987 reorganization.
C. Breach of Fiduciary Duty
Stockholders in a close corporation owe one another “substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another,” i.e., a duty of “utmost good faith and loyalty.” Donahue v. Rodd Electrotype Co. Of New England, Inc., supra at 593. Such stockholders “must discharge their management responsibilities in conformity with this strict good faith standard. They may not act out of avarice, expediency or self-interest in derogation of their duty of loyally to the other stockholders and to the corporation.” Id.
In Wilkes v. Spring side Nursing Home, Inc., 370 Mass. 842 (1976), the court recognized that majority shareholders in a close corporation have “rights to what has been termed ‘selfish ownership’ in the corporation which should be balanced against the concept of their fiduciary obligation to the minority.” Id. at 851. Therefore, a court must “carefully analyze the action taken by the controlling stockholders in the *714 individual case. It must be asked whether the controlling group can demonstrate a legitimate business purpose for its action.” If the majority can establish such a purpose, then “it is open to minority stockholders to demonstrate that the same legitimate objective could have been achieved through an alternative course of action less harmful to the minority’s interest. ... If called on to settle a dispute, our courts must weigh the legitimate business purpose, if any, against the practicability of a less harmful alternative.” Id. at 851-852.
In assessing whether the majority has demonstrated a legitimate business purpose for its action, a court should consider “the fact that the controlling group in a close corporation must have some room to maneuver in establishing the business policy of the corporation. It must have a large measure of discretion, for example, in . . . deciding whether to merge or consolidate . . ." Id. at 851.
The controlling stockholders’ fiduciary duty to the minority includes the duty not to contravene the minority’s rightful expectations of the benefits of ownership in the corporation. See Bodio v. Ellis, 401 Mass. 1, 10 (1987) (defendant’s contravention of plaintiffs “rightful expectation that he would have equal control with . . . [the defendant] . . . constituted a violation of the loyalty and fiduciary duty owed between the shareholders”); Merola v. Exergen Corp., 38 Mass.App.Ct. 462, 469 (1995) (firing of minority stockholder contravened his “reasonable expectation” that he would receive a return on his investments with continued employment); Hallahan v. Haltom Corp., 7 Mass.App.Ct. 68, 71 (1979) (balance of control which “the parties had envisioned and which they had a fiduciary duty to each other to maintain” was restored).
Controlling shareholders also have a fiduciary duly of disclosure to the minority. Wilson v. Jennings, 344 Mass. 608, 616 (1962); cf. Jessie v. Boynton, 372 Mass. 293, 299-00 (1977) (notice of directors or stockholders meetings must fairly warn of actions to be taken).
In cases of alleged freeze-out and self-dealing, “a judge should examine with closest scrutiny the motives and behavior of the controlling stockholder.” Coggins v. New England Patriots Football Club, Inc., 397 Mass. 525, 533 (1986). “A controlling stockholder who is also a director standing on both sides of the transaction bears the burden of showing that the transaction does not violate fiduciary obligations.” Id.
In some cases, the evidence will support an inference that the controlling stockholders’ motive was to harm the minority, not to benefit the corporation. Merola v. Exergen Corp., 38 Mass.App.Ct. at 467. However, fraudulent or other harmful intent is not essential to a finding of breach of fiduciary duly; unjust enrichment will suffice. Sagalyn v. Meekins, Packard & Wheat, Inc., 290 Mass. 434, 439 (1935). As the court there noted:
The trust responsibility to refrain from taking an undue advantage of the corporation persists . . . Everybody is presumed to intend the natural consequences of his actions, and not infrequently this principle requires the inference of breach of fiduciary duty from particular conduct even in the absence of moral turpitude. Unjust enrichment of one occupying a trust relationship at the expense of his fiduciary is scrutinized carefully in a court of equity.
Cf. Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 544 (1997) (in derivative action, directors who diverted corporate opportunities may be liable even where they were not personally unjustly enriched, but benefits accrued to a third party); Salamon v. Terra, 394 Mass. 857, 859 (1985) (“The injustice of the enrichment or detriment . . . equates with the defeat of someone’s reasonable expectations.” (citations omitted)).
Where the disputed transaction is a “freeze-out merger,” in which “the danger of abuse of fiduciary duty is especially great,” Coggins, supra at 534, the court must be satisfied not only that the merger was for the advancement of a legitimate corporate purpose, but that “the transaction was fair [in] the totality of the circumstances.” Id. Consequently, defendants in such a case “bear the burden of proving, first, that the merger was for a legitimate business purpose, and, second, that, considering the totality of the circumstances, it was fair to the minority.” Id. at 534-35.
When a claim of breach of fiduciary duty is established, the appropriate relief may include rescission of the offending transaction, or other restitution; if no equitable relief is appropriate, money damages will be awarded. Coggins, supra at 535-36; cf. Demoulas, supra at 556 (“Where a corporate fiduciary obtains a gain or advantage through a violation of his duty of loyalty, a court may properly order restitution of the gain, so as to deny any profit to the wrongdoer and prevent his unjust enrichment.”)
D. The January 27, 1986 Issuance of Stock to Defendants
1. Statute of Limitations
Defendants assert that Horton’s claims are time-barred to the extent that they are based upon the defendants’ January 27, 1986 vote to issue stock to themselves. Defendants argue that Horton learned, or should have learned, of the January 27, 1986 stock issuance on November 2, 1987.
Horton’s claims are governed by the three-year limitation contained in G.L.c. 260, §2A. Houle v. Low, 407 Mass. 810, 812 (1990). Cf. Demoulas v. Demoulas Super Markets, Inc., supra at 517 (shareholder derivative action for breach of fiduciary duty through diversion of corporate opportunities and self dealing *715 sounds in tort). Plaintiffs filed this action on October 15, 1992. Therefore, if Horton knew as early as November 1987 of his claim arising out of the January 27, 1986 vote, or under the circumstances is charged with such knowledge, his claim is barred. Horton bears the burden of proving that the facts take the case outside of the statute of limitations. Williams v. Ely, 423 Mass. 467, 474-75 (1986).
The statute of limitations may be tolled, under G.L.c. 260, §12, “if the wrongdoer . . . breached a fiduciary duty of full disclosure.” Puritan Medical Center, Inc. v. Cashman, 413 Mass. 167, 175 (1992). “Where ... ‘a fiduciary relationship exists between plaintiff and defendant . . . mere failure to reveal information may be sufficient to constitute fraudulent conduct for purposes of [G.L.c. 260,] §12.’ ” Id. at 176 (citations omitted). “An actual knowledge standard applies to a plaintiff who argues that a breach of fiduciary duty of disclosure constitutes fraudulent concealment under . . . §12.” Demoulas v. Demoulas Super Markets, Inc., 424 Mass. at 519. In such a case, a plaintiff is not held “to a reasonable diligence standard so as to invoke the so-called discovery rule, applicable in most cases, that a cause of action accrues for purposes of the statute of limitations on the happening of an event likely to put the plaintiff on notice of facts giving rise to the cause of action.” Id. at 520.
The Court has found that Horton attended the stockholders annual meeting of November 2, 1987; that at that meeting the total number of shares represented by stockholders at the meeting (220,050) was announced; that that number substantially exceeds the 133,600 shares outstanding prior to January 1986; and that Horton was thereby put on inquiry notice that additional stock had been issued after February 4, 1985, when the total number of shares issued also stood at 133,600. The Court has also found that, at the November 2, 1987 meeting, the minute books evidencing the January 27, 1986 stock issuance, as well as the minutes of the May 13, 1986 stockholders meeting listing the number of shares held by each defendant, were open for inspection.
Thus, as of November 2, 1987, Horton was in possession of information which, had he made reasonable inquiry, would have led him to discover the issuance of 22,225 shares to each defendant. Absent a fiduciary duly of disclosure by defendants, the discovery rule would apply, and the statute as to Horton’s claim would thus have begun to run November 2, 1987.
In the circumstances of this case, however, the actual knowledge standard applies. It was not enough for defendants, as fiduciaries, to set before Horton, at the November 2, 1987 meeting, information “likely to put [him] on notice of facts giving rise to the cause of action.” Demoulas v. Demoulas Super Markets, Inc., supra at 520. Because the Court has found that Horton did not have actual knowledge on November 2, 1987, or at any time before October 15, 1989, of the January 27, 1986 stock issuance, his claim is not time-barred.
2. Breach of Fiduciary Duly
Plaintiffs have failed to prove that defendants breached their fiduciary duty to plaintiffs in January 1986.
Assuming that defendants’ undisclosed January 27, 1986 vote to issue stock to themselves is prima facie actionable as a dilution of plaintiffs’ stock in Vital, defendants must demonstrate a legitimate business purpose for their action. Wilkes v. Springside Nursing Home, Inc., supra, 370 Mass. at 851. The Court rules that defendants have met their burden by demonstrating that the issuance of 22,225 shares of Vital to each defendant was fair compensation for services which defendants rendered in 1985 to Vicam, on Vital’s behalf, pursuant to the Technical Assistance Agreement. This ruling is based principally on the following findings:
a. A cash-strapped Vital had, on several occasions prior to February 1985, compensated individuals for services by issuing stock (including, besides initial issuances to defendants, the issuance of 300 shares to plaintiff Murphy in 1984).
b. At the February 4, 1985 board meeting, the directors approved issuance of stock to defendants and, at Horton’s suggestion, to Karr and plaintiffs Ayers and Laughnan, as compensation for past services.
c. At the same board meeting, Horton and defendant directors voted to authorize the formation of the joint venture; to terminate “all agreements” between Vital and any individual, including earlier consulting agreements pursuant to which defendants were entitled to compensation; and to approve the joint venture documents including the Technical Assistance Agreement, which obligated Vital to cause defendants to provide technical assistance to Vicam, but did not require Vicam to pay any defendant individually for such services.
d. Defendants, pursuant to the Technical Assistance Agreement, did provide services to Vicam between February 1985 and January 1986, on at least a weekly basis, devoted primarily to developing the ill-fated ELISA mycotoxin detection technology.
e. Defendants’ direct services to Vicam fulfilled Vital’s obligation under the Technical Assistance Agreement.
f. Defendants could look for payment for their 1985 services, if at all, only to Vital. Prior to the board meeting of January 27, 1986, there was no agreement between Vital and defendants regarding any compensation for those services.
*716 g. Vital’s by-laws authorized the directors to issue any authorized and unissued stock “to such persons ... in such manner and amounts and for such consideration or considerations ... as the directors may in their discretion from time to time determine."
h. Vital’s by-laws did not require notice to shareholders of meetings of the board of directors.
i. At the beginning of 1986, Vital had no cash to pay defendants for their services to Vicam in 1985.
j. Defendants voted the issuance of 22,225 shares to themselves at the January 27, 1986 board meeting as compensation for their past services to Vicam, and as an incentive to continue working to develop the new approach which Groopman had discovered earlier that month.
k. Defendants’ vote was consistent with the intent of the board’s vote on February 4, 1985, that defendants’ consulting agreements with Vital were terminated, to be replaced with agreements “more appropriate to the present structure” of Vital as a passive partner in Vicam, and as an entity which generated no revenues itself.
l. In February 1985 it should have been apparent to all directors, including Horton, that the only way in which Vital could compensate those whom it caused to consult for Vicam under the Technical Assistance Agreement was to issue stock of Vital.
m. The value of 22,225 shares of Vital in January 1986 did not exceed $13,335, which was far less than each defendant would have earned at his normal consulting rate for his 1985 services to Vicam. The amount of Vital stock issued to each defendant was reasonable.
For the above reasons, the Court also rules that the January 27, 1986 transaction was fair in all the circumstances.
Plaintiffs have not established that the same legitimate objective of the January 27,1986 stock issuance could have been achieved through an alternative course of action less harmful to their interest. They were passive stockholders in Vital, with little or no involvement in the business of the joint venture. The January 27, 1986 stock issuance had no effect on Horton’s right to a royalty on sales of an aflatoxin detection device, which he later received in full. In short, there was simply no way other than the stock issuance by which to compensate defendants for their year’s work, a fact known to plaintiffs from the outset of the joint venture.
Accordingly, plaintiffs have failed to carry their burden on their claim for breach of fiduciary duty based on the January 27, 1986 stock issuance.
E. The November 1987 Reorganization of Vicam
Defendants’ reorganization of Vicam Corporation, the joint venture, into Vicam Limited Partnership, resulted in the halving of Vital’s interest in the business it had transferred to the joint venture in exchange for 50% of the stock therein. After the complex limited partnership reorganization was complete, Vital was left with 25% of the stock of Vicam Limited Partnership, and defendants collectively held the 25% interest which Vital had lost. The Court rules that, in the circumstances, the November 1987 reorganization supports a prima facie claim that defendants wrongfully diluted plaintiffs’ stock, and misappropriated a corporate asset; that defendants have demonstrated a legitimate business purpose for the reorganization and the reallocation of half of Vital’s interest to defendants; and that plaintiffs have demonstrated that the same legitimate objective could have been achieved through an alternative course of action less harmful to the minority’s interest. This ruling is based principally on the following findings:
a. The purpose of the reorganization was to create a tax-advantaged limited partnership, thereby improving the likelihood that defendants and the Radio group could raise some $3,000,000 from outside investors to fund development of the new aflatoxin detection technology.
b. Defendants and the Radio group recognized that they could not perpetuate the defendants’ 5% Consulting Agreements, because investors would not invest in a business 25% of the profits of which were committed to insiders.
c. As between defendants and the limited partnership, the issuance to defendants of 40% of the stock of Vicam Management, representing 25% of the stock of the limited partnership, was supported by adequate consideration — principally, the defendants’ foregoing potentially substantial compensation under the 5% Consulting Agreements, and agreeing to execute new consulting agreements providing a fixed compensation.
d. The defendants and the Radio group concluded that the only way for defendants each to receive 5% of the limited partnership was to reduce Vital’s share from 50% to 25%.
e. Although Horton learned, earlier in 1987, that a limited partnership was being formed to raise money, defendants failed to disclose to plaintiffs that Vital’s share therein, and therefore their share, was to be reduced by half. Horton first learned of the reduction in 1991.
f. Specifically, defendants failed to inform Horton, at the November 2, 1987 stockholders meeting, of the impending reduction in Vital’s interest in Vicam which defendants knew would occur two weeks later.
g. Defendants did not act with fraudulent intent, nor did they affirmatively set out to deprive plaintiffs of their share in the business; rather, defendants acted without due regard to the effect of the reorganization on Vital’s principal asset — its 50% interest in Vicam— and on plaintiffs. Defendants’ actions resulted in both *717 a misappropriation of a corporate asset of Vital, and an unnecessary dilution of plaintiffs’ share in that asset.
h. Defendants were unjustly enriched at the expense of plaintiffs by the reallocation to defendants of half of Vital’s interest in Vicam.
i. Certain collateral matters, principally involving the corn product spin-off and cancellation of shares offered to plaintiffs Ayers and Laughnan, are not evidence of any course of conduct by defendants intended to deprive plaintiffs of their benefits of stock ownership in Vital.
j. The November 1987 reorganization could have been structured so that plaintiffs were left with the same passive interest in the limited partnership as they had had in the joint venture. See discussion in Section F. below.
For the foregoing reasons, the Court also concludes that the November 1987 reorganization, in the totality of the circumstances, was unfair to plaintiffs.
F. Relief
The parties are in agreement that the November 1987 reorganization cannot and should not be altered by an order rescinding the issuance of 40% of the stock of the managing general partner, Vicam Management, to defendants. They point out that third parties invested money in reliance upon the structure and ownership interests established in November 1986; that tax laws and other regulations dictated the manner in which the reorganization was structured; and that the reorganization has been in place for a decade. Such factors persuaded the court in Coggins v. New England Patriots Football Club, Inc., supra, 397 Mass. at 535-36, that rescission of the transaction in that case “does not appear to be equitable at this time.” The Court agrees with the parties that altering the structure of the November 1987 reorganization now would be impractical and unwise.
Defendants argue that alternative equitable relief is available. Plaintiffs argue that it is not, and that they should be awarded damages measured by the present value of the limited partnership. The Court concludes that it was feasible in November 1987, and remains feasible today, to alter the parties’ relative interests in Vital so as to restore to plaintiffs their reasonably expected benefits of stock ownership in Vital without upsetting the structure of the limited partnership. Cf. Bodio v. Ellis, supra, 401 Mass. at 10 (parties’ expectations of equal control restored by ordering defendant to transfer shares back to the corporation); Hallahan v. Haltrom Corp., supra, 7 Mass.App.Ct. at 71 (same).
Prior to the November 1987 reorganization, Vital owned 50% of the stock of Vicam, the joint venture. Plaintiffs together owned 8.8% of the issued stock of Vital. Therefore, plaintiffs owned, indirectly, 4.4% of the equity of the joint venture, and they reasonably expected that their indirect equity interest in the joint venture would remain unchanged.
The November 1987 reorganization changed plaintiffs’ equity interest in Vicam as follows. Following the reorganization, Vital owned 25% of the equity in the new limited partnership, rather than the 50% equity which it had owned in Vicam. Accordingly, plaintiffs’ combined 8.8% of the stock of Vital represented indirect ownership of 2.2% of the limited partnership, or one-half of their previous 4.4% share of Vicam.
The Court therefore will order that defendants transfer to plaintiffs shares in Vital (and any dividends paid thereon) sufficient to restore plaintiffs to the position they were in before the limited partnership was formed, i.e., sufficient to increase their indirect ownership of equity in the limited partnership to the 4.4% interest in the business they owned prior to November 1987. The restoration will be accomplished by taking from defendants, on a pro rata basis, that number of shares which will double plaintiffs’ interest in the issued stock of Vital.
Thus, Horton’s 17,000 shares will be doubled to 34,000 shares; Ayers and Laughnan’s 2,000 shares, respectively, will each be doubled to 4,000 shares; and Murphy’s 300 shares will be doubled to 600 shares. The total increase in plaintiffs’ shares, 21,300, will be apportioned equally among the five defendants (4,260 shares per defendant). Following the transfer, plaintiffs will own 42,600 shares of Vital, or 17.6%, and defendants will own 174,825 shares, or 72.4%. Control of Vital will not be affected.
ORDER OF JUDGMENT
For the reasons set forth above, it is hereby ORDERED that judgment shall enter for defendants on plaintiffs’ claim for breach of fiduciary duty based upon the January 27, 1986 issuance of Vital Technologies, Inc. stock to defendants; that judgment shall enter for plaintiffs on their claim for breach of fiduciary duty based upon the November 1987 reorganization of Vicam Corporation; and that each defendant shall tender to plaintiffs, at no charge, 4,260 shares of Vital Technologies, Inc., together with any dividends paid thereon, plaintiffs to accept such tenders in the following amounts: Bernard S. Horton, 17,000 shares; Arthur R. Ayers, 2,000 shares; Estate of John R. Laughnan, 2,000 shares; George F. Murphy Jr., 300 shares.

 See Rulings of Law, Section A, below, for a more detailed summary of the parties’ claims and defenses, and of the Court’s rulings.

 Mycotoxins are injurious products of fungi; although ubiquitous, they tend to be concentrated in grains and the animals which eat grains, and in dried fruit, vegetables and peanuts. Aflatoxin is a form of mycotoxin. Found predominantly in grains and peanuts, aflatoxin is the world’s most potent cancer-producing substance.

 Karr is not a party to this action.

 Federal regulations set a specific quantity standard for aflatoxin above which the grain was not fit for consumption.

 On March 17, 1986, defendants voted to cancel 2,000 shares previously voted for Ayers, 3,000 shares for Karr, and 2,000 shares for Laughnan, or 7,000 shares in total. See findings below. Except for these reductions in the outstanding shares, and the succession of the Estate of John R. Laughnan to the shares of Laughnan, the stockholders of Vital and the number of shares they hold have remained the same to the present day.

 “Undesignated revenue” is defined in each agreement as Vicam’s revenues for the year less (a) amounts retained by Vicam’s board for research and development costs, capital expenditures, working capital and other corporate purposes, and (b) all expenses of Vicam.